FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

OCT 22 2003

LUTHER D. THOMAS, Clerk
By: _____ Deputy Clerk

**· ORIGINAL**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| VOICE-TEL ENTERPRISES, LLC and VOICECOM TELECOMMUNICATIONS, LLC | ) ) ) ) | |
| Plaintiffs | ) ) | |
| | ) | CIVIL ACTION FILE |
| vs. | ) ) | NO.: 1-01-CV-3359-TWT |
| JOBA, INC. d/b/a VOICE-TEL OF SOUTH FLORIDA and DIGITAL COMMUNICATION SERVICES, INC. d/b/a VOICE-TEL OF SOUTH FLORIDA, | ) ) ) ) ) ) | |
| Defendants | ) | |

## DEFENDANT JOBA, INC.'S MOTION IN LIMINE TO EXCLUDE TESTIMONY OF A. FRANK ADAMS, III

Defendant JOBA, Inc. ("JOBA") hereby files its Motion in Limine to Exclude Testimony of A. Frank Adams, III, respectfully showing the Court as follows:

### Introduction

In this motion, JOBA seeks to exclude the testimony of A. Frank Adams III, phD ("Dr. Adams"), Plaintiffs' designated damages expert. As will be shown, the damages Dr. Adams identifies in his expert report are barred by the express terms of the Voice-Tel Operations Manual and by the voluntary payment doctrine. Accordingly, Dr. Adams should not be permitted to testify at the trial of this matter.

248

## Statement of Relevant Facts

### A.   The Nature of Plaintiffs' Claim for "Overpayment"

JOBA's protected territory prohibits the franchisor from selling directly into JOBA's territory.  Thus, to accommodate the voice messaging needs of so-called "national account" customers who reside in JOBA's territory, the franchisor purchases service from JOBA (the parties refer to this as a "provisioning fee") and then bills the customer in a separate transaction.  Such franchisor/franchisee transactions used to be governed by the "National Accounts Program Agreement" ("NAP Agreement"), which the Court ruled is now defunct.  See March 31, 2003 Order.

Plaintiffs contend that they have "overpaid" JOBA for provisioning service to national accounts since 1997.  This claim is not based on a contract, but rather, curiously, on the **spirit** of a contract - the now defunct NAP Agreement. Specifically, Plaintiffs allege that they have in recent years paid JOBA higher provisioning fees than what was "historically" paid to JOBA for provisioning such services pursuant to the very agreement that Plaintiffs terminated - the NAP Agreement. Hence, Plaintiffs argue they are entitled to recover these voluntary "overpayments."

2

The Voice-Tel Operations Manual, which is incorporated by reference into the JOBA Franchise Agreement, speaks directly to this issue:

**Pricing Set by the Franchised Business:**

Except for prices set by the National Accounts Program Cooperative (NAPC)(if the Franchised Business is a participating member), **the Franchised Business can charge any specific price or fee for services that the Franchised Business deems appropriate.**

See Voice-Tel Operations Manual Policy 3.31, attached hereto as **Exhibit A** (emphasis added).

Mr. Alan Carter, the co-founder and CEO of Voice-Tel, also confirmed that in the absence of the NAP Agreement, a franchisee could unilaterally set provisioning fees for service in its protected territory:

[Y]ou knew that if you were going to sell a mailbox in somebody else's system, you knew ahead of time what it was going to cost you.  You didn't have to call that franchisee and say, **"Gee, I've got 50 mailboxes I'd like to put on your system.  What are you going to charge me for them?"** which is what the franchisees used to do before there was an NAPC.

See Deposition of Alan Carter, p. 109 (emphasis added).

### B.    The Adams Report

The statistical basis for Plaintiffs' damages claim is set forth in Dr. Adams's expert report (the "Report"), a true and correct copy of which is attached hereto as **Exhibit B.** Essentially, Dr. Adams opines that the provisioning fees that

the franchisor paid JOBA from 1997 through the present were "commercially unreasonable" and greater than what JOBA was previously paid under the NAP Agreement.  The Adams Report does not endeavor to reconcile Plaintiffs' damages theory with Operations Manual Policy 3.31 or the above-excerpted testimony of Mr. Carter, however.

It is undisputed that at no time prior to this litigation did Plaintiffs ever demand reimbursement of any "overpayments" to JOBA, send JOBA an invoice, or otherwise indicate that they were paying provisioning fees to JOBA under protest.  Nor is there any evidence to suggest that the franchisor did not know exactly what it was paying JOBA in provisioning fees for each and every month since 1997.

### Argument and Citation to Authority:

The basis for this motion is straightforward: Dr. Adams should not be permitted to testify about damages that are not recoverable as a matter of law.  First, as shown above, Plaintiffs' complaint that they have "overpaid" JOBA for provisioning fees is barred by the Operations Manual, which provides that in the absence of the NAP Agreement, a "Franchised Business can charge any specific price or fee for services that the Franchised Business deems appropriate."  See **Exhibit A.**

4

Second, Plaintiffs' complaint is barred by the voluntary payment doctrine.  Under Ohio law, which governs the JOBA Agreement, the general rule is that payments voluntarily made cannot be recovered.  See Lamborn v. County Commissioners, 97 U.S. 181, 185 (1877)("A voluntary payment, made with full knowledge of all facts and circumstances of the case, though made under a mistaken view of the law, cannot be revoked, and the money so paid cannot be recovered back"); E.H. Taylor, Jr. & Sons v. First National Bank of Aurora, Ind., 212 F. 898, 902 (6th Cir. 1914)(same); In Re Estate of Kangesser, 18 Ohio St. 2d 139, 247 N.E.2d 724 (1969)("a voluntary payment of money made under a mistake of law is not recoverable, is the recognized rule in Ohio"); Sampsell v. Mutual Building & Investment Co., 1896 Ohio Misc. LEXIS 552, 12 Ohio Cir. Dec. 597; 22 Ohio C.C. 614, 617 (8th Cir. Ohio 1896)("It is well known to counsel in the case and to everybody else familiar with the law, that if that payment was a voluntary payment, if she voluntarily paid this money, knowing all the facts, she cannot recover it back").

In this case, Plaintiffs knowingly and voluntarily paid all of the provisioning fees they now seek to recover.  There is no evidence to the contrary, nor does Adams suggest otherwise in his Report.  The voluntary payment doctrine bars Plaintiffs' claim for "overpyament."

5

Adams should not be permitted to testify at trial because the damages outlined in his report are not recoverable as a matter of law.  Allowing such testimony will only serve to unnecessarily prolong and complicate the trial of this matter.

Respectfully submitted this 22nd day of October, 2003.

Cary Ichter
Georgia Bar No. 382515
T. Joshua Archer
Georgia Bar No.
Matthew B. Ames
Georgia Bar No. 015898

**BALCH & BINGHAM**
3535 Piedmont Road
Fourteen Piedmont Center
Suite 1100
Atlanta, Georgia 30305
(404) 261-6020



# EXHIBIT / ATTACHMENT

(To be scanned in place of tab)

# PRICING AND SERVICE AGREEMENTS

| Effective Date:   December 15, 1993 | Policy Number:   3.31 |
|---|---|
| Supersedes:   N/A | Page Number:   1 of 1 |

## STATEMENT OF PURPOSE

The purpose of this policy is to require the Franchised Business to comply with any service agreements made by the Franchised Business and to specify clearly the price-setting authority of the Franchised Business.

## POLICY PROVISIONS

1. <u>Service Agreements Compliance</u>
   The Franchised Business must comply with any service agreements or contracts made by the Franchised Business.

2. <u>Pricing Set by the Franchised Business</u>
   Except for prices set by the National Accounts Program Cooperative (NAPC) (if the Franchised Business is a participating member), the Franchised Business can charge any specific price or fee for services that the Franchised Business deems appropriate.

## RECOMMENDED PRACTICE

1. <u>Service Contracts</u>
   Use the VTE Service Contract shown in Exhibit 3.31A for all customers of the Franchised Business.

## EXHIBIT

See Exhibit 3.31A for the VTE *Service Contract.*

003843


**VOICE-TEL**
Voice Messaging Network
Confidential



EXHIBIT / 

$B.$

(To be scanned in place of tab)

# Expert Witness Report

## of

## A. Frank Adams, III, Ph.D.

### pursuant to

### Rule 26(a)(2)(B)
### of the Federal Rules of
### Civil Procedure

### September 23, 2003

This report is submitted pursuant to Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure.

## I.   QUALIFICATIONS

I hold a Ph.D. in Economics and currently teach graduate students at Kennesaw State University, in the Executive MBA program. I also teach in a Corporate In-House Executive MBA program available for BellSouth employees, through Kennesaw State.

I have substantial practical business experience as a corporate officer in a franchise business. For the past three years, I have been an instructor for the National Association of Certified Valuation Analysts, teaching in their Forensic Institute Program. I have published several peer-reviewed articles in economics journals, on both economics and finance topics, and made numerous presentations, all of which are listed in my Curriculum Vita, attached hereto as Exhibit 1.

The opinions set forth below are based on my franchisor/franchisee relationships, business practice and experience, and telecommunications industry knowledge and experience, education, training and review of literature.

## II.   SCOPE OF ENGAGEMENT

I have been engaged to calculate the amount of damages that Voice-Tel Enterprises, LLC, Voice-Tel Enterprises, Inc., and Voicecom Telecommunications, LLC ('Voicecom") (hereinafter collectively referred to as "Voice-Tel") incurred as a result of certain actions of JOBA, Inc. ("JOBA"), which Voice-Tel contends constitutes an unjust enrichment as a result of unfair business practices for charging commercially unreasonable fees to provision voice mailbox services for the franchisor's national customers on JOBA's system.

This report describes my work to date and summarizes my opinions and the basis for those opinions. The opinions and findings are based upon my work to date and upon the pattern of facts that I have thus far observed. I may, pursuant to Rule 26(e)(1), supplement, update or modify this report at a later date based upon additional documents or information.[1] I have also

---

[1] Specifically, within the last week the franchisor performed an audit of the computer billing systems of JOBA. Based on data derived from the audit, JOBA sales outside its protected territory apparently exceeds $500,000. A portion of these sales are believed by the franchisor to constitute "encroachment." Further data is required before I can analyze damages associated with these sales.

been retained to analyze the claim for damages offered by JOBA. This report is not intended to include my response to JOBA's claim for damages. My analysis of JOBA's claim for damages will be set forth in a separate document and will be prepared after the report of JOBA's damages has been released.

This report has been prepared solely in connection with this litigation and is intended for no other use.

### III. DATA OR INFORMATION REVIEWED FOR THIS REPORT

The first step of my damage analysis was to review various business records produced in discovery by the parties, including but not limited to, the franchise agreement, the operations manual and deposition testimony. In addition to reviewing these records, I also interviewed Voice-Tel's management and franchisee liaison to gain an understanding of the companies, their financial situation, and their customers. I also reviewed a number of documents created or produced during discovery, including computer spread sheets of sales activities. A list of the documents that were reviewed for the purpose of forming the opinions described in this report is attached as Schedule 1.

### IV. SUMMARY OF OPINION

As set forth in detail below, it is my opinion that, based upon Voice-Tel's claims of unjust enrichment associated with payment to JOBA of commercially unreasonable rates for provisioning services, the damages associated with JOBA's over-compensation for provisioning services ranges from $71,477 and $116,622 for the time period March 2002, to the present. Alternatively, if the time period from May 1997, to the present is considered, then the damages associated with Voice-Tel's overpayment to JOBA ranges from $784,904 and $1,280,656 (Schedule 2).

### V. SUMMARY OF EVENTS RELATING TO THE CLAIMS FOR DAMAGES

The Voice-Tel franchise system began in the late 1980's. For an initial franchise fee of $75,000, JOBA obtained the right to operate a voice mailbox service center and to use the Voice-Tel Proprietary Marks within a prescribed area in the State of Florida (zip codes 333, 334 and

33060-68).[2]

Between the late 1980s and 1997, Voice-Tel sold franchises and their franchisees, in turn, sold voice mail boxes on a system called "Centigram."[3] During the 1980s and into the mid-1990s, Voice-Tel franchisees were generally successful in the voice messaging market.[4]  Prior to 1997, the franchise sold voice mailboxes to customers, who could call a local number and retrieve voice messages.  From its inception until 1997, the only product sold by the franchise "system" was voice mailboxes using "Centigram" equipment.[5]

By 1996, the franchisor's owners and the leaders of the franchisee organization believed that the franchise system was threatened by emerging technologies, falling prices and a lack of capital to obtain needed improvements and products for the franchise system to remain competitive.[6]  The franchisor tried unsuccessfully to sell the system before 1997.  In 1997, Premiere Technologies, Inc. ("Premiere") offered to purchase the franchisor, the franchise frame relay network and any franchisee who wished to sell.[7]  Franchisees who wished to remain and not sell were offered the opportunity to sell new products if they signed a "Grand Solution" document.[8]

In 1997, the company that purchased the franchisor made signing of a "Grand Solution" document a condition of receiving new services and products.[9]  The JOBA franchise agreement specifically provides that new products may be offered on terms and conditions set forth by the Franchisor.[10]  Digital and JOBA were the only franchisees that did not sign the Grand Solution, therefore they were unable to obtain new products (which were acquired or developed by the franchisor) that were offered to those franchises that signed the Grand Solution agreement.[11]

Since 1997, Voice-Tel continued to offer the same voicemail products to JOBA that JOBA received prior to the acquisition.[12]

---

[2] See Franchise Agreement, Exhibit D
[3] See Deposition Testimony of Alan Carter dated August 26, 2002.
[4] See Deposition Testimony of Alan Carter.
[5] See Deposition Testimony of Alan Carter, Deposition of Larry Diana dated  August 7, 2002 and Deposition of Barry Passarew  dated  August 5, 2002.
[6] See  Deposition Testimony of Bill Welsh dated June 7, 2002.
[7] See Deposition Testimony of Bill Welsh.
[8] See Deposition Testimony of Bill Welsh and Jeff Allred dated September 5, 2002..
[9] See Memo to all Franchisees, April 1997
[10] See Franchise Agreement, p. 3.
[11] See Deposition Testimony of Bill Welsh and Jeff Allred and Agreement Among Voice-Tel Enterprises, Inc. And VTE National Accounts Program And Participating Franchisees.
[12] Deposition of Patrick Jones dated June 25, 2002.

Multiple attempts were made by both parties to avoid a lawsuit and negotiate a buy-out or establish a new business relationship.[13]  In March 2002, the franchisor's assets, including the franchise agreements, were sold to VoiceCom Telecommunications, LLC.  This nationwide messaging company along with other major technology and assets were sold for less than $8 million in cash and the assumption of approximately $13 million in debt.[14]

After the acquisitions in 1997, JOBA engaged in conduct that the franchisor contends constitutes a breach of contract, including but not limited to, failing to pay franchise fees on time, and failure to develop the franchise business.[15]  Additionally, the franchisor contends that the franchisee has become unjustly enriched by demanding a commercially unreasonable rate to provision mailboxes on the JOBA system- sometimes in excess of 100% of revenues actually received from customers.[16]  Specifically, I have been asked to analyze damages flowing from claims relating to unjust enrichment for provisioning fees paid by the franchisor to JOBA.

## VI. METHODOLOGY

The conventional way to calculate damages is to determine the amount of money required to put Voice-Tel in the position it would have been absent the alleged wrongful conduct that forms the basis of the damage claim.  This approach can be broken down into the following steps:

### A.      Identify the Wrongful Conduct

The alleged wrongful conduct in this case includes JOBA's refusal to service "National Accounts" (these are customers owned by the franchisor who require local access services in many parts of the country) unless Voice-Tel paid a fee that was contrary to franchise custom and counter to commercial reasonableness.  My damage calculations cover the period from March, 2002 through the present and from May, 1997 through the present.

### B.      Determine the Economic Impact Resulting from the Wrongful Conduct and Measure the Damages

---

[13] Deposition of Mark Harris dated August 21, 2002.
[14] See PTEK SEC filings 2002.
[15] See Deposition Testimony of Sean Dowd dated September 3, 2002.
[16] See Deposition Testimony of Sean Dowd and Emails from Barry Pinciss to Sean Dowd, bates label 013218-013220.

JOBA's receipt of excessive reimbursement and compensation fees for provisioning mailboxes resulted in an inequitable benefit to JOBA and lost revenue to Voice-Tel.

Typically, lost economic damages related to lost profits, in this case stemming from an inequitable benefit, are calculated as the incremental profits Voice-Tel would have generated, but for the wrongful actions of JOBA. This amount is determined by first calculating the revenue lost by Voice-Tel. Next, the costs that were "saved" as a result of not generating the lost revenue are deducted. The difference is lost incremental profits. In this case, Voice-Tel performed all the necessary actions and incurred all the costs associated with generating the lost revenue. In other words, there are no "saved" expenses. Therefore, the damages to Voice-Tel are equal to the revenues it would have received "but for" the actions of JOBA.

A detailed discussion of the calculation of the economic damages is described below.

## VII. STATEMENT OF OPINION

**Voice-Tel is owed between $71,477 and $116,622, resulting from its overpayment of provisioning fees to JOBA during the time period March 2002, to the present. Voice-Tel is owed between $784,904 and $1,280,656, resulting from its overpayment of provisioning fees to JOBA during the time period May 1997, to the present**

### A.    Basis for Loss

Under the historic arrangement between buying and selling companies using the Voice-Tel network, including JOBA, when one franchisee sold voicemail services to a customer that had operations in multiple territories, the selling franchisee provisioned mailboxes from franchisees outside his local territory. Provisioning fees are the amounts paid for use of voice mailboxes.

I understand that prior to 1997 the mechanism for splitting the revenue between buying and selling franchisees was handled by the former National Accounts Programs Cooperative, which sought to provide revenue to both the selling and the providing entities in a commercially reasonable manner. I have been asked to assume, and the data suggests, that provisioning fees were designed to provide a fair sharing or split of revenue between the company buying a mailbox and the company selling the mailbox and that this split constituted a business custom for

the franchise system. I have been asked to assume, and the data reflects, that the historic and commercially reasonable "split" of revenue between buying and selling companies ranged between 50/50 of the sales price and 60/40 of sales price, with the selling company receiving 60%.

During the period of May, 1997 through June, 2003, JOBA demanded, and Voice-Tel paid, provisioning fees well beyond the business custom regarding provisioning fees associated with buyers and sellers of voice mailboxes. In some instances, the provisioning fees demanded by JOBA were in excess of 100% of the associated revenue received by Voice-Tel. I have been asked to assume that as of May 1997, the historic provisioning fees should have been in effect. Alternatively, I have been asked to perform damage calculations assuming that as of March 2002, the historic provisioning fees should have been in effect.

### B.    Method of Calculation of Damages for Unjust Enrichment on Provisioning Fees

Voice-Tel's management has provided detail, through their computer accounting records and contract rates, showing the provisioning payments received by JOBA from Voice-Tel, the billings by Voice-Tel for voice mailboxes sold into and provisioned on the JOBA system, and the contracts rates for affected products. Utilizing this data, I have calculated the ranges for overpayments on a monthly basis using historically agreed upon prices as well as current prices for services. The overpayment percentage was applied to the historical provisioning payments to JOBA, to determine the monthly overpayment from May, 1997 through June, 2003 and from March, 2002 through June, 2003. Based on my analysis, I have calculated the amount due Voice-Tel for its overpayment of provisioning fees to JOBA, to be between $784,904 and $1,280,656 from May, 1997 through June, 2003. Alternatively, from March, 2002 through June, 2003, the amount due Voice-Tel for its overpayment of provisioning fees is calculated to be between $71,477 and $116,622. (Schedules 3, 3.01, 3.1, 3.2, 3.11, 3.12, 3.13, 3.14, 3.15, 3.16, 3.17, 3.21, 3.22, 3.23, 3.24, 3.25, 3.26, 3.27). The range in damages would be attributable to the difference between a 50/50 fee split, a 60/40 fee split and whether contract prices or historical product pricing was used.

In support of the aforementioned range of overpayments, I took the average of the percentage of overcharges in the seven periods for which both the actual payment and the appropriate payment were known. That number turned out to be 36.7%. I then applied this

estimate to each observation on the actual payment to calculate the probable overcharge for that period. Finally, I added all of these overcharges to get a total percent overcharge for the full period. Based on time-series econometric analysis, my damages calculation[17] is perhaps too conservative.[18] My reason for suggesting that the estimated overcharge should be higher is based on the fact that all of the known overcharges took place during a known depressed economic period for the franchisor. Fully two thirds of the observations in the sample refer to a period when the economic climate was much better. Thus, if percentage of overcharges track actual provisioning payments, there is good reason to extrapolate that overcharges were higher in the earlier period.

To investigate this possibility, I began by estimating a set of time trends for actual provisioning payments made to the company, as fully described in Schedule 4.

## VIII. PEER REVIEWED LITERATURE AND OTHER AUTHORITY SUPPORTIVE OF DAMAGE CALCULATION METHODOLOGY

For a partial list of reference materials see Schedule 5.

## IX. COMPENSATION

I charge an hourly rate for work actually performed. My fees for work performed on this matter are attached in Schedule 6.

---

[17] The sample size used to calculate damages proved to be statistically reliable.
[18] See Gurjarati, Damodar. 1995 Basic Econometrics, New York: McGraw Hill.

Submitted this 23rd day of September 2003,

A. Frank Adams, III, Ph.D.

Sworn to and subscribed before
me this 23rd day of September,
2003.

Notary Public, Cobb County, Georgia
My Commission Expires November 2, 2004

# EXHIBIT

# ONE

# VITA

## A. FRANK ADAMS, III, PH.D.

Financial Economist
*Department of Leadership & Professional Development*
Executive MBA Programs
Michael J. Coles College of Business
Kennesaw State University
Kennesaw, GA  30144-5591
Office: (770) 420-4468
Fax: (770) 499-3665
Email:  frank_adams@coles2.kennesaw.edu

Dr. Adams has over 10 years of business experience with a substantial portion of that being involved as a corporate officer and controller of a family held business that was the 3rd franchisee of Waffle House, Inc.  His current academic position, teaching exclusively in the Executive MBA (EMBA) Programs at Kennesaw State University, involves teaching strategy, corporate finance and economics.  Kennesaw's EMBA programs include a traditional program, available to working adults from a wide range of industries, and a Corporate In-House Executive MBA program for BellSouth available only to employees of that company.  Dr. Adams research has focused on industrial organization and regulation as well as valuation issues in the context of litigation.  His consulting activities include valuation work in closely held companies, business plan development and litigation support.  In addition, for the past two years he has been an instructor for the National Association of Certified Valuation Analysts, teaching economics and statistics in their Forensic Institute Program.

## EDUCATION

*Auburn University*
Auburn, AL
Ph.D., Economics, 1996
Specialization:  Finance, International Economics

Berry College
Rome, GA
MBA, 1982

Shorter College
Rome, GA
B. S., Business Administration, 1980

1

## ACADEMIC EXPERIENCE

Financial Economist, Executive MBA Programs, January 2000-present, Kennesaw State University.
Assistant Professor of Economics/Finance, 1998-1999, Troy State University.
Assistant Professor of Finance, 1997-1998, Eastern New Mexico University.
Associate Professor of Finance, 1996-1997, Gustavus Adolphus College.

## TEACHING/RESEARCH INTERESTS

Corporate Finance, Investments, Applied Microeconomics, Economics of Regulation and Industrial Organization, International Economics, History of Economic Thought, Forensic Economics.

**Courses Taught:**

Graduate:  Strategy (Executive MBA), Corporate Finance (MBA & Executive MBA), Business Research (MBA), Macroeconomics (Executive MBA), Microeconomics (Executive MBA), International Trade & Finance (Executive MBA), Financial Accounting (Executive MBA).

Undergraduate:  Corporate Finance, Principles of Finance, Investments, International Economics, Principles of Microeconomics, Principles of Macroeconomics, Introduction to Data Processing, Money and Banking, Labor Economics.

## REFEREED JOURNAL ARTICLES

"Occupational Licensing of a Credence Good:  The Regulation of Midwifery," with Robert B. Ekelund, Jr. and John D. Jackson, *Southern Economic Journal*, Volume 69, Number 3, January 2003, pp. 659-675.

"Corporate America's Search for the 'Right' Direction:  Outlook and Opportunities for Family Firms," with Sheb L. True and Robert D. Winsor, *Family Business Review*, Volume XV, Number 4, December 2002, pp. 269-276.

"Characteristics of Those 'Offended' By Organ Procurement Alternatives," with Peter T. Calcagno, *Atlantic Economic Journal,* Volume 30, Number 2, June 2002, p. 222.

"Occupational Licensing in a 'Competitive' Labor Market:  The Case of Cosmetology," with John D. Jackson and Robert B. Ekelund, Jr., *Journal of Labor Research*, Volume XXIII, Number 2, Spring 2002, pp. 261-278.

"Capital Market Theory and Real Estate Valuation:  A Case Study in Choosing an 'Appropriate' Discount Rate," with John D. Jackson and J. Philip Cook, *Journal of Forensic Economics,* 14 (2), 2001, pp. 119-133.

"Markets for Organs:  The Question of Supply," with A.H. Barnett and David L. Kaserman, *Contemporary Economic Policy*, Volume 17, Number 2, April 1999.

"Search Costs and Price Dispersion in a Localized Homogeneous Product Market:  Some Empirical Evidence," the *Review of Industrial Organization*, Volume 12, Issue 5/6, December 1997.

## REPRINTS IN BOOKS & MONOGRAPHS

"Markets for Organs:  The Question of Supply," with A.H. Barnett and David L. Kaserman, *Contemporary Economic Policy*, Volume 17, Number 2, April 1999.  Reprinted substantially in David L. Kaserman and A.H. Barnett, *The U.S. Organ Procurement System:  A Prescription for Reform*, Chapter 6, Washington, D.C.:  AEI (American Enterprise Institute) Press, 2002.

## PRESENTATIONS AND PAPERS IN PROCEEDINGS

"Royalty Rates in Patent Infringement Cases:  A Look at Recent Court Decisions," with Budina Naydenova, *presented at the international meeting of the National Association of Forensic Economics,  January 30-February 1, 2003, St. Thomas, USVI.

"EVA in Family Business," presented at the Summer 2002 Family Business Forum, Cox Family Enterprise Center, August 28, 2002, Kennesaw State University, Kennesaw, GA.

Participation with M. Lyn Reagan, MPA, CPA, CVA (Certified Valuation Analyst), Bennett-Thrasher, Atlanta, GA, in delivering seminar to area Domestic Mediators and Judicial Officers (Fulton County), December 7, 2001.

"Valuing Long-Term Leases:  A Case Study," with John D. Jackson and J. Philip Cook, presented at the International Applied Business Research Conference, March 14-21, 2001, Cancun, Mexico.

"Practice Cost Analysis:  A Traditional Cost Accounting Approach vs. A Marginal Analysis Approach," with Dwight Hooper, M.D., Georgia Academy of Family Practitioners (GAFP), November 3, 2000, Cobb Galleria, Marietta, GA.

"Informational Asymmetry and Occupational Regulation," Troy State University System-Wide Business Symposium Presentation and Proceedings, February 12-13, 1999.

## NEWSPAPER EDITORIALS

"Case of too many dollars chasing too few projects," Guest Column, *The Times-Herald*, Newnan, Georgia, May 12, 1999.

## PROFESSIONAL RECOGNITION & AWARDS

2002 Instructor of Exceptional (Highest) Distinction, Awarded by the National Association of Certified Valuation Analysts (NACVA) May 29, 2003. This award is NACVA's highest category of recognition for instruction and was awarded to a select few.

2001 Instructor of Exceptional (Highest) Distinction, Awarded by the National Association of Certified Valuation Analysts (NACVA) May 22, 2002. This award is NACVA's highest category of recognition for instruction and was awarded to only 8 out of 60+ instructors.

Coles College Outstanding Scholar Award 2001/2002, Awarded May 13, 2002, Michael J. Coles College of Business, Kennesaw State University, Kennesaw, GA. The Coles College employs more than 80 full-time tenured, or tenure-track faculty.

## PROFESSIONAL AFFILIATIONS, ACTIVITIES & EXAMINATIONS

Course Development & Instruction for Professional Organizations

Developed courses and served as an instructor for the National Association of Certified Valuation Analyst's (NACVA's) Forensic Institute Week One and Week Three Economics/Statistics Courses (1 day 8-hour courses) on the following dates:

| Date | Place | Week |
|------|-------|------|
| August 15, 2001 | Chicago, IL | Three |
| October 3, 2001 | Washington, DC. | Three |
| October 15, 2001 | Orlando, FL | One |
| November 26, 2001 | Las Vegas, NV | One |
| August 13, 2002 | Toronto, Ontario | One |
| October 1, 2002 | Phoenix, AZ | One |
| November 12, 2002 | Atlanta, GA | One |

4

Participation in Specialized Courses

NACVA's (National Association of Certified Valuation Analysts) Business Valuation and
Certification Training (40 hours), February 5-9, 2001, Atlanta, GA.

NACVA's Career Development Institute, Valuing Medical Practices (8 hours), August 28, 2000,
Annapolis, MD.

NACVA's Litigation Consultant Training, August 30-September 1, 2000, Annapolis, MD:
  Commercial Damages-Legal Theory & Case Law (8 hours)
  Specialty Areas of Litigation (8 hours)
  Calculating Personal Losses and Business Losses (8 hours)

| | |
|---|---|
| Member: | National Association of Forensic Economics |
| | National Association of Certified Valuation Analysts (NACVA) |
| | |
| Professional Examinations: | NASD Series 6 -- Investment Company/Variable Contracts Registered Representative's Examination – June 2000 |
| | NASD Series 65 – Uniform Investment Adviser Law Examination – December 1999 |

Journal Editorial Review Board: *Journal of Executive Education*
Ad hoc reviewer: *Family Business Review*

## NON-ACADEMIC EXPERIENCE

**LECG, LLC, Salt Lake City, Utah:**  Affiliate Member.  Litigation and Consulting Services.
May 2003-present.

**Integrity Rehabilitation & Testing, Lawrenceville, GA:**  Economic and Financial Expert.
Project economic damages based on information provided by Life Care Planners and
Rehabilitation Specialists in personal injury litigation.  February 2003 – present.

**Convenience Store, Dublin, GA:**  Owner and operator.  Optioned location, conducted
marketing surveys, negotiated construction and permanent financing, acted as general contractor,
and trained staff.  September 1988 - July 1989 (project inception - store opening), July 1989 -
June 1990 (operation of store - negotiation of sale).

**Adams and Lumley Construction Co., Dublin, GA:**  President.  Company specialized in
residential (primarily custom-built) and small commercial construction in the Dublin, GA area.
March 1985 - March 1989 (corporation dissolved).

5

**Coastal Waffles, Inc., Dublin, GA:** Secretary of the Corporation and Controller. Responsible for all accounting functions (except yearly tax returns), including monthly P&L, balance sheet, and quarterly tax reports for 11 restaurants (Waffle House Franchisee) in a family owned business. I worked in the business from August 1979 ~ August 1980 and from September 1982 - March 1989. The business was sold in March 1989 and I participated and played a significant role in the negotiations for the sale of the business.

**WWG Industries (Trend/Roxbury Carpet), Rome, GA:** Credit Analyst. Responsible for analyzing mercantile credit applications for this carpet manufacturer for the southeastern U. S.; also responsible for handling selected collection accounts. February 1981 - April 1982.

# SCHEDULES

## Voice-Tel Enterprises  v. JOBA, Inc.
**List of Documents Reviewed**                    **Schedule 1**

1   3/31/03 Order by Judge Thomas W. Thrash Jr.
2   JOBA, Inc. Franchise Agreement
3   Letter from Barry Pinciss to Charles M. Feuer, President, Voice Enterprises, Inc.
4   Amendments to Franchise Agreement - JOBA, Inc.and Voice Enterprises, Inc. 12/12/89
5   Service Representative Agreement
6   JOBA, Inc. - U.S. Corporation Income Tax Returns (1996-2002)
7   Various financial information contained in JOBA's electronic accounting files
8   Various provisioning fee statements
9   Current and historical provisioning fee data
10  Miscellaneous documents required to perform analysis
11  Deposition of Patrick Jones dated June 25, 2002.
12  Deposition of Mark Harris dated August 21, 2002.
13  Deposition of Alan Carter dated August 26, 2002
14  Deposition of Larry Diana dated August 07, 2002
15  Deposition of Barry Pasarew dated August 05, 2002
16  Deposition of Bill Welsh dated June 07, 2002
17  Depostition of Jeff Allred dated September 5, 2002
18  Memo to all Franchisees dated April 1997
19  Agreement Among Voice-Tel Enterprises, Inc. And VTE National Accounts Program And Participating F
20  PTEK SEC filings 2002
21  Deposition of Sean Dowd dated September 03, 2002
22  Emails from Barry Pinciss to Sean Dowd, bates label 013218-013220.

**Voice-Tel Enterprises  v. JOBA, Inc.**
**Summary of Damages due Voice-Tel from JOBA, Inc.**                    Schedule 2

**May 1997 through June 2003**
**Amount Owed for Overpaid**
**Provisioning Fees:**                    **$784,904 - $1,280,656**      Schedule 3

**Total Amount Owed Voice-Tel:**    $784,904 - 1,280,656

**March 2002 through June 2003**
**Amount Owed for Overpaid**
**Provisioning Fees:**                    **$71,477 - $116, 622**      Schedule 3.01

**Total Amount Owed Voice-Tel:**    $71,477 - $116,622

## Voice-Tel Enterprises  v. JOBA, Inc.
## Amounts Due Voice-Tel for Overpayment of Provisioning Fees        Schedule 3

| | Actual Provisioning Fee Paid | Overpayment Percent (Scenario 1) | Scenario 1 Overpaid Provisioning Fees | Overpayment Percent (Scenario 2) | Scenario 2 Overpaid Provisioning Fees |
|---|---|---|---|---|---|
| May-97 | $ 29,862 | 36.7% | $ 10,955 | 59.9% | $ 17,874 |
| Jun-97 | $ 28,812 | 36.7% | $ 10,570 | 59.9% | $ 17,246 |
| Jul-97 | $ 28,400 | 36.7% | $ 10,418 | 59.9% | $ 16,999 |
| Aug-97 | $ 28,598 | 36.7% | $ 10,491 | 59.9% | $ 17,117 |
| Sep-97 | $ 28,445 | 36.7% | $ 10,435 | 59.9% | $ 17,026 |
| Oct-97 | $ 27,816 | 36.7% | $ 10,204 | 59.9% | $ 16,649 |
| Nov-97 | $ 27,935 | 36.7% | $ 10,248 | 59.9% | $ 16,720 |
| Dec-97 | $ 27,721 | 36.7% | $ 10,169 | 59.9% | $ 16,592 |
| Jan-98 | $ 28,236 | 36.7% | $ 10,358 | 59.9% | $ 16,901 |
| Feb-98 | $ 27,806 | 36.7% | $ 10,200 | 59.9% | $ 16,643 |
| Mar-98 | $ 28,769 | 36.7% | $ 10,554 | 59.9% | $ 17,220 |
| Apr-98 | $ 29,480 | 36.7% | $ 10,815 | 59.9% | $ 17,646 |
| May-98 | $ 29,872 | 36.7% | $ 10,959 | 59.9% | $ 17,880 |
| Jun-98 | $ 30,332 | 36.7% | $ 11,127 | 59.9% | $ 18,155 |
| Jul-98 | $ 30,778 | 36.7% | $ 11,291 | 59.9% | $ 18,423 |
| Aug-98 | $ 30,374 | 36.7% | $ 11,143 | 59.9% | $ 18,181 |
| Sep-98 | $ 30,762 | 36.7% | $ 11,285 | 59.9% | $ 18,413 |
| Oct-98 | $ 31,154 | 36.7% | $ 11,429 | 59.9% | $ 18,647 |
| Nov-98 | $ 31,938 | 36.7% | $ 11,716 | 59.9% | $ 19,117 |
| Dec-98 | $ 33,904 | 36.7% | $ 12,438 | 59.9% | $ 20,294 |
| Jan-99 | $ 35,368 | 36.7% | $ 12,975 | 59.9% | $ 21,170 |
| Feb-99 | $ 33,689 | 36.7% | $ 12,359 | 59.9% | $ 20,165 |
| Mar-99 | $ 34,219 | 36.7% | $ 12,553 | 59.9% | $ 20,482 |
| Apr-99 | $ 39,047 | 36.7% | $ 14,324 | 59.9% | $ 23,372 |
| May-99 | $ 39,329 | 36.7% | $ 14,428 | 59.9% | $ 23,541 |
| Jun-99 | $ 40,637 | 36.7% | $ 14,908 | 59.9% | $ 24,323 |
| Jul-99 | $ 31,818 | 36.7% | $ 11,672 | 59.9% | $ 19,045 |
| Aug-99 | $ 40,305 | 36.7% | $ 14,786 | 59.9% | $ 24,124 |
| Sep-99 | $ 42,015 | 36.7% | $ 15,413 | 59.9% | $ 25,148 |
| Oct-99 | $ 38,826 | 36.7% | $ 14,243 | 59.9% | $ 23,240 |
| Nov-99 | $ 45,808 | 36.7% | $ 16,805 | 59.9% | $ 27,419 |
| Dec-99 | $ 43,741 | 36.7% | $ 16,046 | 59.9% | $ 26,181 |
| Jan-00 | $ 43,736 | 36.7% | $ 16,044 | 59.9% | $ 26,178 |
| Feb-00 | $ 47,033 | 36.7% | $ 17,254 | 59.9% | $ 28,152 |
| Mar-00 | $ 41,404 | 36.7% | $ 15,189 | 59.9% | $ 24,782 |
| Apr-00 | $ 45,432 | 36.7% | $ 16,667 | 59.9% | $ 27,194 |
| May-00 | $ 42,497 | 36.7% | $ 15,590 | 59.9% | $ 25,437 |
| Jun-00 | $ 41,909 | 36.7% | $ 15,374 | 59.9% | $ 25,085 |
| Jul-00 | $ 41,443 | 36.7% | $ 15,203 | 59.9% | $ 24,806 |
| Aug-00 | $ 41,673 | 36.7% | $ 15,288 | 59.9% | $ 24,944 |
| Sep-00 | $ 38,499 | 36.7% | $ 14,123 | 59.9% | $ 23,044 |
| Oct-00 | $ 38,285 | 36.7% | $ 14,045 | 59.9% | $ 22,916 |
| Nov-00 | $ 40,250 | 36.7% | $ 14,766 | 59.9% | $ 24,092 |
| Dec-00 | $ 37,845 | 36.7% | $ 13,883 | 59.9% | $ 22,652 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Jan-01 | $ | 39,908 | 36.7% | $ | 14,640 | 59.9% | $ 23,887 |
| Feb-01 | $ | 35,892 | 36.7% | $ | 13,167 | 59.9% | $ 21,483 |
| Mar-01 | $ | 34,232 | 36.7% | $ | 12,558 | 59.9% | $ 20,490 |
| Apr-01 | $ | 37,157 | 36.7% | $ | 13,631 | 59.9% | $ 22,240 |
| May-01 | $ | 38,654 | 36.7% | $ | 14,180 | 59.9% | $ 23,136 |
| Jun-01 | $ | 32,696 | 36.7% | $ | 11,994 | 59.9% | $ 19,570 |
| Jul-01 | $ | 31,407 | 36.7% | $ | 11,522 | 59.9% | $ 18,799 |
| Aug-01 | $ | 28,345 | 36.7% | $ | 10,398 | 59.9% | $ 16,966 |
| Sep-01 | $ | 23,150 | 36.7% | $ | 8,492 | 59.9% | $ 13,856 |
| Oct-01 | $ | 17,882 | 36.7% | $ | 6,560 | 59.9% | $ 10,703 |
| Nov-01 | $ | 17,733 | 36.7% | $ | 6,505 | 59.9% | $ 10,614 |
| Dec-01 | $ | 17,836 | 36.7% | $ | 6,543 | 59.9% | $ 10,676 |
| Jan-02 | $ | 17,017 | 36.7% | $ | 6,243 | 59.9% | $ 10,186 |
| Feb-02 | $ | 17,034 | 36.7% | $ | 6,249 | 59.9% | $ 10,196 |
| Mar-02 | $ | 15,609 | 36.7% | $ | 5,726 | 59.9% | $ 9,343 |
| Apr-02 | $ | 15,351 | 36.7% | $ | 5,632 | 59.9% | $ 9,189 |
| May-02 | $ | 13,243 | 36.7% | $ | 4,858 | 59.9% | $ 7,927 |
| Jun-02 | $ | 12,431 | 36.7% | $ | 4,560 | 59.9% | $ 7,441 |
| Jul-02 | $ | 12,488 | 36.7% | $ | 4,581 | 59.9% | $ 7,475 |
| Aug-02 | $ | 13,705 | 36.7% | $ | 5,028 | 59.9% | $ 8,203 |
| Sep-02 | $ | 13,796 | 36.7% | $ | 5,061 | 59.9% | $ 8,257 |
| Oct-02 | $ | 14,113 | 36.7% | $ | 5,177 | 59.9% | $ 8,447 |
| Nov-02 | $ | 10,992 | 36.7% | $ | 4,032 | 59.9% | $ 6,579 |
| Dec-02 | $ | 10,913 | 36.7% | $ | 4,003 | 59.9% | $ 6,532 |
| Jan-03 | $ | 11,033 | 36.7% | $ | 4,048 | 59.9% | $ 6,604 |
| Feb-03 | $ | 11,329 | 36.7% | $ | 4,156 | 59.9% | $ 6,781 |
| Mar-03 | $ | 11,080 | 36.7% | $ | 4,065 | 59.9% | $ 6,632 |
| Apr-03 | $ | 10,464 | 36.7% | $ | 3,839 | 59.9% | $ 6,263 |
| May-03 | $ | 9,392 | 36.7% | $ | 3,445 | 59.9% | $ 5,622 |
| Jun-03 | $ | 8,901 | 36.7% | $ | 3,265 | 59.9% | $ 5,327 |
| Jul-03 | $ | - | 36.7% | $ | - | 59.9% | $ - |

**Provisioning Fees
Paid to JOBA**          $   2,139,583

**Total Overpayment of Provisioning
Fees by Voice-Tel:**          $   784,904          $   1,280,656

# Voice-Tel Enterprises v. JOBA, Inc.
## Amounts Due Voice-Tel for Overpayment of Provisioning Fees        Schedule 3.0

|  | Actual Provisioning Fee Paid | Overpayment Percent (Scenario 1) | Scenario 1 Overpaid Provisioning Fees | Overpayment Percent (Scenario 2) | Scenario 2 Overpaid Provisioning Fees |
|---|---|---|---|---|---|
| May-97 | $ 29,862 | 36.7% | $ 10,955 | 59.9% | $ 17,874 |
| Jun-97 | $ 28,812 | 36.7% | $ 10,570 | 59.9% | $ 17,246 |
| Jul-97 | $ 28,400 | 36.7% | $ 10,418 | 59.9% | $ 16,999 |
| Aug-97 | $ 28,598 | 36.7% | $ 10,491 | 59.9% | $ 17,117 |
| Sep-97 | $ 28,445 | 36.7% | $ 10,435 | 59.9% | $ 17,026 |
| Oct-97 | $ 27,816 | 36.7% | $ 10,204 | 59.9% | $ 16,649 |
| Nov-97 | $ 27,935 | 36.7% | $ 10,248 | 59.9% | $ 16,720 |
| Dec-97 | $ 27,721 | 36.7% | $ 10,169 | 59.9% | $ 16,592 |
| Jan-98 | $ 28,236 | 36.7% | $ 10,358 | 59.9% | $ 16,901 |
| Feb-98 | $ 27,806 | 36.7% | $ 10,200 | 59.9% | $ 16,643 |
| Mar-98 | $ 28,769 | 36.7% | $ 10,554 | 59.9% | $ 17,220 |
| Apr-98 | $ 29,480 | 36.7% | $ 10,815 | 59.9% | $ 17,646 |
| May-98 | $ 29,872 | 36.7% | $ 10,959 | 59.9% | $ 17,880 |
| Jun-98 | $ 30,332 | 36.7% | $ 11,127 | 59.9% | $ 18,155 |
| Jul-98 | $ 30,778 | 36.7% | $ 11,291 | 59.9% | $ 18,423 |
| Aug-98 | $ 30,374 | 36.7% | $ 11,143 | 59.9% | $ 18,181 |
| Sep-98 | $ 30,762 | 36.7% | $ 11,285 | 59.9% | $ 18,413 |
| Oct-98 | $ 31,154 | 36.7% | $ 11,429 | 59.9% | $ 18,647 |
| Nov-98 | $ 31,938 | 36.7% | $ 11,716 | 59.9% | $ 19,117 |
| Dec-98 | $ 33,904 | 36.7% | $ 12,438 | 59.9% | $ 20,294 |
| Jan-99 | $ 35,368 | 36.7% | $ 12,975 | 59.9% | $ 21,170 |
| Feb-99 | $ 33,689 | 36.7% | $ 12,359 | 59.9% | $ 20,165 |
| Mar-99 | $ 34,219 | 36.7% | $ 12,553 | 59.9% | $ 20,482 |
| Apr-99 | $ 39,047 | 36.7% | $ 14,324 | 59.9% | $ 23,372 |
| May-99 | $ 39,329 | 36.7% | $ 14,428 | 59.9% | $ 23,541 |
| Jun-99 | $ 40,637 | 36.7% | $ 14,908 | 59.9% | $ 24,323 |
| Jul-99 | $ 31,818 | 36.7% | $ 11,672 | 59.9% | $ 19,045 |
| Aug-99 | $ 40,305 | 36.7% | $ 14,786 | 59.9% | $ 24,124 |
| Sep-99 | $ 42,015 | 36.7% | $ 15,413 | 59.9% | $ 25,148 |
| Oct-99 | $ 38,826 | 36.7% | $ 14,243 | 59.9% | $ 23,240 |
| Nov-99 | $ 45,808 | 36.7% | $ 16,805 | 59.9% | $ 27,419 |
| Dec-99 | $ 43,741 | 36.7% | $ 16,046 | 59.9% | $ 26,181 |
| Jan-00 | $ 43,736 | 36.7% | $ 16,044 | 59.9% | $ 26,178 |
| Feb-00 | $ 47,033 | 36.7% | $ 17,254 | 59.9% | $ 28,152 |
| Mar-00 | $ 41,404 | 36.7% | $ 15,189 | 59.9% | $ 24,782 |
| Apr-00 | $ 45,432 | 36.7% | $ 16,667 | 59.9% | $ 27,194 |
| May-00 | $ 42,497 | 36.7% | $ 15,590 | 59.9% | $ 25,437 |
| Jun-00 | $ 41,909 | 36.7% | $ 15,374 | 59.9% | $ 25,085 |
| Jul-00 | $ 41,443 | 36.7% | $ 15,203 | 59.9% | $ 24,806 |
| Aug-00 | $ 41,673 | 36.7% | $ 15,288 | 59.9% | $ 24,944 |
| Sep-00 | $ 38,499 | 36.7% | $ 14,123 | 59.9% | $ 23,044 |
| Oct-00 | $ 38,285 | 36.7% | $ 14,045 | 59.9% | $ 22,916 |
| Nov-00 | $ 40,250 | 36.7% | $ 14,766 | 59.9% | $ 24,092 |
| Dec-00 | $ 37,845 | 36.7% | $ 13,883 | 59.9% | $ 22,652 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Jan-01 | $ | 39,908 | 36.7% | $ | 14,640 | 59.9% | $ | 23,887 |
| Feb-01 | $ | 35,892 | 36.7% | $ | 13,167 | 59.9% | $ | 21,483 |
| Mar-01 | $ | 34,232 | 36.7% | $ | 12,558 | 59.9% | $ | 20,490 |
| Apr-01 | $ | 37,157 | 36.7% | $ | 13,631 | 59.9% | $ | 22,240 |
| May-01 | $ | 38,654 | 36.7% | $ | 14,180 | 59.9% | $ | 23,136 |
| Jun-01 | $ | 32,696 | 36.7% | $ | 11,994 | 59.9% | $ | 19,570 |
| Jul-01 | $ | 31,407 | 36.7% | $ | 11,522 | 59.9% | $ | 18,799 |
| Aug-01 | $ | 28,345 | 36.7% | $ | 10,398 | 59.9% | $ | 16,966 |
| Sep-01 | $ | 23,150 | 36.7% | $ | 8,492 | 59.9% | $ | 13,856 |
| Oct-01 | $ | 17,882 | 36.7% | $ | 6,560 | 59.9% | $ | 10,703 |
| Nov-01 | $ | 17,733 | 36.7% | $ | 6,505 | 59.9% | $ | 10,614 |
| Dec-01 | $ | 17,836 | 36.7% | $ | 6,543 | 59.9% | $ | 10,676 |
| Jan-02 | $ | 17,017 | 36.7% | $ | 6,243 | 59.9% | $ | 10,186 |
| Feb-02 | $ | 17,034 | 36.7% | $ | 6,249 | 59.9% | $ | 10,196 |
| Mar-02 | $ | 15,609 | 36.7% | $ | 5,726 | 59.9% | $ | 9,343 |
| Apr-02 | $ | 15,351 | 36.7% | $ | 5,632 | 59.9% | $ | 9,189 |
| May-02 | $ | 13,243 | 36.7% | $ | 4,858 | 59.9% | $ | 7,927 |
| Jun-02 | $ | 12,431 | 36.7% | $ | 4,560 | 59.9% | $ | 7,441 |
| Jul-02 | $ | 12,488 | 36.7% | $ | 4,581 | 59.9% | $ | 7,475 |
| Aug-02 | $ | 13,705 | 36.7% | $ | 5,028 | 59.9% | $ | 8,203 |
| Sep-02 | $ | 13,796 | 36.7% | $ | 5,061 | 59.9% | $ | 8,257 |
| Oct-02 | $ | 14,113 | 36.7% | $ | 5,177 | 59.9% | $ | 8,447 |
| Nov-02 | $ | 10,992 | 36.7% | $ | 4,032 | 59.9% | $ | 6,579 |
| Dec-02 | $ | 10,913 | 36.7% | $ | 4,003 | 59.9% | $ | 6,532 |
| Jan-03 | $ | 11,033 | 36.7% | $ | 4,048 | 59.9% | $ | 6,604 |
| Feb-03 | $ | 11,329 | 36.7% | $ | 4,156 | 59.9% | $ | 6,781 |
| Mar-03 | $ | 11,080 | 36.7% | $ | 4,065 | 59.9% | $ | 6,632 |
| Apr-03 | $ | 10,464 | 36.7% | $ | 3,839 | 59.9% | $ | 6,263 |
| May-03 | $ | 9,392 | 36.7% | $ | 3,445 | 59.9% | $ | 5,622 |
| Jun-03 | $ | 8,901 | 36.7% | $ | 3,265 | 59.9% | $ | 5,327 |
| Jul-03 | $ | - | 36.7% | $ | - | 59.9% | $ | - |

**Provisioning Fees**
**Paid to JOBA**          $   2,139,583

**Total Overpayment of Provisioning**
**Fees by Voice-Tel:**          $   71,477          $   116,622

## Voice-Tel Enterprises  v. JOBA, Inc.
## Provisioning Fee Overpayment Support Summary - Scenario 1                 Schedule 3.1

| Provisioning Statement Date | | Provisioning Fee Paid to JOBA <1> | | Adjusted Provisioning Fee <1> | | Overpayment | Overpayment as a Percent of Actual Provisioning Fee Paid |
|---|---|---|---|---|---|---|---|
| Nov-01 | $ | 17,733 | $ | 10,930 | $ | 6,803 | 38.4% |
| Jan-02 | $ | 17,017 | $ | 10,661 | $ | 6,356 | 37.4% |
| Apr-02 | $ | 15,351 | $ | 9,131 | $ | 6,221 | 40.5% |
| Jul-02 | $ | 12,488 | $ | 8,002 | $ | 4,486 | 35.9% |
| Oct-02 | $ | 14,113 | $ | 8,861 | $ | 5,252 | 37.2% |
| Jan-03 | $ | 11,033 | $ | 7,377 | $ | 3,657 | 33.1% |
| Apr-03 | $ | 10,464 | $ | 6,877 | $ | 3,587 | 34.3% |

**Average Overpayment Percentage**                                                  36.7%

<1> See Supporting Exhibits 3.11 to 3.17 for details.

## Voice-Tel Enterprises  v. JOBA, Inc.
**Provisioning Fee Overpayment Support Summary - Scenario 2**          **Schedule 3.2**

| Provisioning Statement Date | Provisioning Fee Paid to JOBA <1> | Adjusted Provisioning Fee <1> | Overpayment | Overpayment as a Percent of Actual Provisioning Fee Paid |
|---|---|---|---|---|
| Nov-01 | $ 17,733 | $ 6,685 | $ 11,048 | 62.3% |
| Jan-02 | $ 17,017 | $ 6,219 | $ 10,798 | 63.5% |
| Apr-02 | $ 15,351 | $ 5,489 | $ 9,862 | 64.2% |
| Jul-02 | $ 12,488 | $ 4,848 | $ 7,641 | 61.2% |
| Oct-02 | $ 14,113 | $ 5,261 | $ 8,851 | 62.7% |
| Jan-03 | $ 11,033 | $ 5,230 | $ 5,803 | 52.6% |
| Apr-03 | $ 10,464 | $ 4,971 | $ 5,492 | 52.5% |
| **Average Overpayment Percentage** | | | | **59.9%** |

<1>  See Supporting Exhibits 3.21 to 3.27 for details.

# Voice-Tel Enterprises  v. JOBA, Inc.
## Provisioning Fee Overpayment Support - Scenario 1          Schedule 3.11

### Reproduction of Actual Provisioning Fee Statement

|  | Interfranchise | | Amway | | Total Gross | |
|---|---|---|---|---|---|---|
| November 2001 Gross Sales: | $ | 13,886 | $ | 5,385 | $ | 19,271 |
| Reductions: | $ | (731) | $ | (808) | $ | (1,539) |
| Net Totals: | $ | 13,155 | $ | 4,578 | $ | 17,733 |
| Provisioning Fee Paid to JOBA: | $ | 17,733 | | | | |

### Adjusted Provisioning Fee Statement <1>

|  | Interfranchise | | Amway | | Total Gross | |
|---|---|---|---|---|---|---|
| November 2001 Gross Sales <2>: | $ | 8,770 | $ | 3,401 | $ | 12,171 |
| Reductions <3>: | $ | (731) | $ | (510) | $ | (1,241) |
| Net Totals: | $ | 8,039 | $ | 2,891 | $ | 10,930 |
| Adjusted Provisioning Fee Paid to JOBA: | $ | 10,930 | | | | |

| | | |
|---|---|---|
| Actual Provisioning Fee Paid: | $ | 17,733 (a) |
| Adjusted Provisioning Fee: | $ | 10,930 (b) |
| Overpayment: | $ | 6,803 (c)=(a-b) |

**Overpayment as a Percent of the Actual**
**Provisioning Fee Paid:**                    **38.4%** (d)=(c/a)


<1> Calculation of what the provisioning fee would have been if historical product pricing
      had been used to determine the provisioning payment.
<2> Gross sales under historical pricing provided by Voice-Tel management. Allocation to Interfranchise
      and Amway based on allocation percentage from actual November 2001 provisioning statement.
<3> Interfranchise reduction assumed to be the same under both scenario's. Amway reduction related
      to royalties, marketing and information services assumed to be 15% of Amway gross revenue.

# Voice-Tel Enterprises  v. JOBA, Inc.
## Provisioning Fee Overpayment Support - Scenario 1          Schedule 3.12

### Reproduction of Actual Provisioning Fee Statement

|  | Interfranchise | Amway | Total Gross |
|---|---|---|---|
| January 2002 Gross Sales: | $  13,004 | $  5,578 | $  18,582 |
| Reductions: | $  (728) | $  (837) | $  (1,565) |
| Net Totals: | $  12,276 | $  4,741 | $  17,017 |
| Provisioning Fee Paid to JOBA: | $  17,017 | | |

### Adjusted Provisioning Fee Statement <1>

|  | Interfranchise | Amway | Total Gross |
|---|---|---|---|
| January 2002 Gross Sales <2>: | $  8,347 | $  3,580 | $  11,926 |
| Reductions <3>: | $  (728) | $  (537) | $  (1,265) |
| Net Totals: | $  7,618 | $  3,043 | $  10,661 |
| Adjusted Provisioning Fee Paid to JOBA: | $  10,661 | | |

| | | |
|---|---|---|
| Actual Provisioning Fee Paid: | $  17,017 | (a) |
| Adjusted Provisioning Fee: | $  10,661 | (b) |
| Overpayment | $  6,356 | (c)=(a-b) |

**Overpayment as a Percent of the Actual**
**Provisioning Fee Paid:**          **37.4%** (d)=(c/a)

<1> Calculation of what the provisioning fee would have been if historical product pricing
    had been used to determine the provision payment.
<2> Gross sales under historical pricing provided by Voice-Tel management. Allocation to Interfranchise
    and Amway based on allocation percentage from actual January 2002 provisioning statement.
<3> Interfranchise reduction assumed to be the same under both scenario's. Amway reduction related
    to royalties, marketing and information services assumed to be 15% of Amway gross revenue.

# Voice-Tel Enterprises  v. JOBA, Inc.
## Provisioning Fee Overpayment Support - Scenario 1          Exhibit 3.13

### Reproduction of Actual Provisioning Fee Statement

|  | | Interfranchise | | Amway | | Total Gross |
|---|---|---|---|---|---|---|
| April 2002 Gross Sales: | $ | 12,646 | $ | 3,955 | $ | 16,602 |
| Reductions: | $ | (657) | $ | (593) | $ | (1,250) |
| Net Totals: | $ | 11,989 | $ | 3,362 | $ | 15,351 |
| Provisioning Fee Paid to JOBA: | $ | 15,351 | | | | |

### Adjusted Provisioning Fee Statement <1>

|  | | Interfranchise | | Amway | | Total Gross |
|---|---|---|---|---|---|---|
| April 2002 Gross Sales <2>: | $ | 7,732 | $ | 2,418 | $ | 10,150 |
| Reductions <3>: | $ | (657) | $ | (363) | $ | (1,020) |
| Net Totals: | $ | 7,075 | $ | 2,056 | $ | 9,131 |
| Adjusted Provisioning Fee Paid to JOBA: | $ | 9,131 | | | | |

| | | | |
|---|---|---|---|
| Actual Provisioning Fee Paid: | $ | 15,351 | (a) |
| Adjusted Provisioning Fee: | $ | 9,131 | (b) |
| Overpayment: | $ | 6,221 | (c)=(a-b) |

**Overpayment as a Percent of the Actual**
**Provisioning Fee Paid:**          **40.5%** (d)=(c/a)

<1> Calculation of what the provisioning fee would have been if historical product pricing
    had been used to determine the provision payment.
<2> Gross sales under historical pricing provided by Voice-Tel management. Allocation to Interfranchise
    and Amway based on allocation percentage from actual April 2002 provisioning statement.
<3> Interfranchise reduction assumed to be the same under both scenario's. Amway reduction related
    to royalties, marketing and information services assumed to be 15% of Amway gross revenue.

## Voice-Tel Enterprises  v. JOBA, Inc.
### Provisioning Fee Overpayment Support - Scenario 1          Schedule 3.14

Reproduction of Actual Provisioning Fee Statement

|  | | Interfranchise | | Amway | | Total Gross |
|---|---|---|---|---|---|---|
| July 2002 Gross Sales: | $ | 11,125 | $ | 2,414 | $ | 13,539 |
| Reductions: | $ | (688) | $ | (362) | $ | (1,050) |
| Net Totals: | $ | 10,437 | $ | 2,052 | $ | 12,488 |
| Provisioning Fee Paid to JOBA: | $ | 12,488 | | | | |

Adjusted Provisioning Fee Statement <1>

|  | | Interfranchise | | Amway | | Total Gross |
|---|---|---|---|---|---|---|
| July 2002 Gross Sales <2>: | $ | 7,337 | $ | 1,592 | $ | 8,929 |
| Reductions <3>: | $ | (688) | $ | (239) | $ | (927) |
| Net Totals: | $ | 6,649 | $ | 1,353 | $ | 8,002 |
| Adjusted Provisioning Fee Paid to JOBA: | $ | 8,002 | | | | |

| Actual Provisioning Fee Paid: | $ | 12,488 | (a) |
|---|---|---|---|
| Adjusted Provisioning Fee: | $ | 8,002 | (b) |
| Overpayment: | $ | 4,486 | (c)=(a-b) |

**Overpayment as a Percent of the Actual**
**Provisioning Fee Paid:**                    **35.9%** (d)=(c/a)

<1> Calculation of what the provisioning fee would have been if historical product pricing
    had been used to determine the provision payment.
<2> Gross sales under historical pricing provided by Voice-Tel management. Allocation to Interfranchise
    and Amway based on allocation percentage from actual July 2002 provisioning statement.
<3> Interfranchise reduction assumed to be the same under both scenario's. Amway reduction related
    to royalties, marketing and information services assumed to be 15% of Amway gross revenue.

# Voice-Tel Enterprises  v. JOBA, Inc.
## Provisioning Fee Overpayment Support - Scenario 1      Schedule 3.15

### Reproduction of Actual Provisioning Fee Statement

|  | Interfranchise | Amway | Total Gross |
|---|---|---|---|
| October 2002 Gross Sales: | $ 12,951 | $ 2,157 | $ 15,108 |
| Reductions: | $ (672) | $ (324) | $ (996) |
| Net Totals: | $ 12,279 | $ 1,834 | $ 14,113 |
| Provisioning Fee Paid to JOBA: | $ 14,113 | | |

### Adjusted Provisioning Fee Statement <1>

|  | Interfranchise | Amway | Total Gross |
|---|---|---|---|
| October 2002 Gross Sales <2>: | $ 8,351 | $ 1,391 | $ 9,741 |
| Reductions <3>: | $ (672) | $ (209) | $ (881) |
| Net Totals: | $ 7,678 | $ 1,182 | $ 8,861 |
| Adjusted Provisioning Fee Paid to JOBA: | $ 8,861 | | |

| | | |
|---|---|---|
| Actual Provisioning Fee Paid: | $ 14,113 | (a) |
| Adjusted Provisioning Fee: | $ 8,861 | (b) |
| Overpayment | $ 5,252 | (c)=(a-b) |

**Overpayment as a Percent of the Actual**
**Provisioning Fee Paid:**      **37.2%** (d)=(c/a)

<1> Calculation of what the provisioning fee would have been if historical product pricing
    had been used to determine the provision payment.
<2> Gross sales under historical pricing provided by Voice-Tel management. Allocation to Interfranchise
    and Amway based on allocation percentage from actual October 2002 provisioning statement.
<3> Interfranchise reduction assumed to be the same under both scenario's. Amway reduction related
    to royalties, marketing and information services assumed to be 15% of Amway gross revenue.

# Voice-Tel Enterprises  v. JOBA, Inc.
## Provisioning Fee Overpayment Support - Scenario 1      Schedule 3.16

### Reproduction of Actual Provisioning Fee Statement

| | | Interfranchise | | Amway | | Total Gross |
|---|---|---|---|---|---|---|
| January 2003 Gross Sales: | $ | 9,080 | $ | 2,914 | $ | 11,994 |
| Reductions: | $ | (523) | $ | (437) | $ | (960) |
| Net Totals: | $ | 8,557 | $ | 2,477 | $ | 11,033 |
| Provisioning Fee Paid to JOBA: | $ | 11,033 | | | | |

### Adjusted Provisioning Fee Statement <1>

| | | Interfranchise | | Amway | | Total Gross |
|---|---|---|---|---|---|---|
| January 2003 Gross Sales <2>: | $ | 6,207 | $ | 1,992 | $ | 8,198 |
| Reductions <3>: | $ | (523) | $ | (299) | $ | (822) |
| Net Totals: | $ | 5,684 | $ | 1,693 | $ | 7,377 |
| Adjusted Provisioning Fee Paid to JOBA: | $ | 7,377 | | | | |

| | | | |
|---|---|---|---|
| Actual Provisioning Fee Paid: | $ | 11,033 | (a) |
| Adjusted Provisioning Fee: | $ | 7,377 | (b) |
| Overpayment | $ | 3,657 | (c)=(a-b) |

**Overpayment as a Percent of the Actual**
**Provisioning Fee Paid:**      **33.1%** (d)=(c/a)

<1> Calculation of what the provisioning fee would have been if historical product pricing
     had been used to determine the provision payment.
<2> Gross sales under historical pricing provided by Voice-Tel management. Allocation to Interfranchise
     and Amway based on allocation percentage from actual January 2003 provisioning statement.
<3> Interfranchise reduction assumed to be the same under both scenario's. Amway reduction related
     to royalties, marketing and information services assumed to be 15% of Amway gross revenue.

## Voice-Tel Enterprises  v. JOBA, Inc.
**Provisioning Fee Overpayment Support - Scenario 1**          **Schedule 3.17**

### Reproduction of Actual Provisioning Fee Statement

|  | Interfranchise | Amway | Total Gross |
|---|---|---|---|
| April 2003 Gross Sales: | $ 8,634 | $ 2,676 | $ 11,310 |
| Reductions: | $ (445) | $ (401) | $ (846) |
| Net Totals: | $ 8,189 | $ 2,274 | $ 10,464 |
| Provisioning Fee Paid to JOBA: | $ 10,464 |  |  |

### Adjusted Provisioning Fee Statement <1>

|  | Interfranchise | Amway | Total Gross |
|---|---|---|---|
| April 2003 Gross Sales <2>: | $ 5,795 | $ 1,796 | $ 7,591 |
| Reductions <3>: | $ (445) | $ (269) | $ (714) |
| Net Totals: | $ 5,350 | $ 1,527 | $ 6,877 |
| Adjusted Provisioning Fee Paid to JOBA: | $ 6,877 |  |  |

| | | |
|---|---|---|
| Actual Provisioning Fee Paid: | $ 10,464 | (a) |
| Adjusted Provisioning Fee: | $ 6,877 | (b) |
| Overpayment: | $ 3,587 | (c)=(a-b) |

**Overpayment as a Percent of the Actual**
**Provisioning Fee Paid:**               **34.3%** (d)=(c/a)

<1> Calculation of what the provisioning fee would have been if historical product pricing
     had been used to determine the provision payment.
<2> Gross sales under historical pricing provided by Voice-Tel management. Allocation to Interfranchise
     and Amway based on allocation percentage from actual April 2003 provisioning statement.
<3> Interfranchise reduction assumed to be the same under both scenario's. Amway reduction related
     to royalties, marketing and information services assumed to be 15% of Amway gross revenue.

# Voice-Tel Enterprises  v. JOBA, Inc.
## Provisioning Fee Overpayment Support - Scenario 2        Schedule 3.21

### Reproduction of Actual Provisioning Fee Statement

|  | Interfranchise | Amway | Total Gross |
|---|---|---|---|
| November 2001 Gross Sales: | $ 13,886 | $ 5,385 | $ 19,271 |
| Reductions: | $ (731) | $ (808) | $ (1,539) |
| Net Totals: | $ 13,155 | $ 4,578 | $ 17,733 |
| Provisioning Fee Paid to JOBA: | $ 17,733 | | |

### Adjusted Provisioning Fee Statement <1>

|  | Interfranchise | Amway | Total Gross |
|---|---|---|---|
| November 2001 Gross Sales <2>: | $ 12,041 | $ 4,670 | $ 16,711 |
| Reductions <3>: | $ (731) | $ (700) | $ (1,431) |
| Net Totals: | $ 11,310 | $ 3,969 | $ 15,280 |
| Adjusted Provisioning Fee Paid to JOBA: | $ 6,685 | | |

| | | |
|---|---|---|
| Actual Provisioning Fee Paid: | $ 17,733 | (a) |
| Adjusted Provisioning Fee: | $ 6,685 | (b) |
| Overpayment | $ 11,048 | (c)=(a-b) |

**Overpayment as a Percent of the Actual**
**Provisioning Fee Paid:**      **62.3%** (d)=(c/a)

<1> Calculation of what the provisioning fee would have been if the contract rate and historical
     seller/provider split (60/40) had been used to determine the provision payment.
<2> Gross sales under current contract pricing provided by Voice-Tel management. Allocation to Interfranchise
     and Amway based on allocation percentage from actual November 2001 provisioning statement.
<3> Interfranchise reduction assumed to be the same under both scenario's. Amway reduction related
     to royalties, marketing and information services assumed to be 15% of Amway gross revenue.

## Voice-Tel Enterprises  v. JOBA, Inc.
**Provisioning Fee Overpayment Support - Scenario 2**　　　　　　　**Schedule 3.22**

Reproduction of Actual Provisioning Fee Statement

|  | Interfranchise | Amway | Total Gross |
|---|---|---|---|
| January 2002 Gross Sales: | $ 13,004 | $ 5,578 | $ 18,582 |
| Reductions: | $ (728) | $ (837) | $ (1,565) |
| Net Totals: | $ 12,276 | $ 4,741 | $ 17,017 |

Provisioning Fee Paid to JOBA:　　$   17,017

Adjusted Provisioning Fee Statement <1>

|  | Interfranchise | Amway | Total Gross |
|---|---|---|---|
| January 2002 Gross Sales <2>: | $ 10,881 | $ 4,667 | $ 15,547 |
| Reductions <3>: | $ (728) | $ (700) | $ (1,428) |
| Net Totals: | $ 10,152 | $ 3,967 | $ 14,119 |

Adjusted Provisioning Fee Paid to JOBA:　　$    6,219

| | | |
|---|---|---|
| Actual Provisioning Fee Paid: | $ 17,017 | (a) |
| Adjusted Provisioning Fee: | $ 6,219 | (b) |
| Overpayment: | $ 10,798 | (c)=(a-b) |

**Overpayment as a Percent of the Actual**
**Provisioning Fee Paid:**　　　　　　**63.5%**

<1> Calculation of what the provisioning fee would have been if the contract rate and historical
　　seller/provider split (60/40) had been used to determine the provision payment.
<2> Gross sales under current contract pricing provided by Voice-Tel management. Allocation to Interfranchise
　　and Amway based on allocation percentage from actual January 2002 provisioning statement.
<3> Interfranchise reduction assumed to be the same under both scenario's. Amway reduction related
　　to royalties, marketing and information services assumed to be 15% of Amway gross revenue.

## Voice-Tel Enterprises  v. JOBA, Inc.
### Provisioning Fee Overpayment Support - Scenario 2                    Schedule 3.23

Reproduction of Actual Provisioning Fee Statement

|  | Interfranchise | Amway | Total Gross |
|---|---|---|---|
| April 2002 Gross Sales: | $    12,646 | $    3,955 | $    16,602 |
| Reductions: | $    (657) | $    (593) | $    (1,250) |
| Net Totals: | $    11,989 | $    3,362 | $    15,351 |
| | | | |
| Provisioning Fee Paid to JOBA: | $    15,351 | | |

Adjusted Provisioning Fee Statement <1>

|  | Interfranchise | Amway | Total Gross |
|---|---|---|---|
| April 2002 Gross Sales <2>: | $    10,453 | $    3,270 | $    13,723 |
| Reductions <3>: | $    (657) | $    (490) | $    (1,147) |
| Net Totals: | $    9,796 | $    2,779 | $    12,575 |
| | | | |
| Adjusted Provisioning Fee Paid to JOBA: | $    5,489 | | |

| | | |
|---|---|---|
| Actual Provisioning Fee Paid: | $    15,351 | (a) |
| Adjusted Provisioning Fee: | $    5,489 | (b) |
| Overpayment | $    9,862 | (c)=(a-b) |

**Overpayment as a Percent of the Actual**
**Provisioning Fee Paid:**                    **64.2%** (d)=(c/a)


<1> Calculation of what the provisioning fee would have been if the contract rate and historical
    seller/provider split (60/40) had been used to determine the provision payment.
<2> Gross sales under current contract pricing provided by Voice-Tel management. Allocation to Interfranchise
    and Amway based on allocation percentage from actual April 2002 provisioning statement.
<3> Interfranchise reduction assumed to be the same under both scenario's. Amway reduction related
    to royalties, marketing and information services assumed to be 15% of Amway gross revenue.

# Voice-Tel Enterprises  v. JOBA, Inc.
## Provisioning Fee Overpayment Support - Scenario 2                Schedule 3.24

### Reproduction of Actual Provisioning Fee Statement

|  | Interfranchise | | Amway | | Total Gross | |
|---|---|---|---|---|---|---|
| July 2002 Gross Sales: | $ | 11,125 | $ | 2,414 | $ | 13,539 |
| Reductions: | $ | (688) | $ | (362) | $ | (1,050) |
| Net Totals: | $ | 10,437 | $ | 2,052 | $ | 12,488 |
| Provisioning Fee Paid to JOBA: | $ | 12,488 | | | | |

### Adjusted Provisioning Fee Statement <1>

|  | Interfranchise | | Amway | | Total Gross | |
|---|---|---|---|---|---|---|
| July 2002 Gross Sales <2>: | $ | 9,959 | $ | 2,161 | $ | 12,119 |
| Reductions <3>: | $ | (688) | $ | (324) | $ | (1,012) |
| Net Totals: | $ | 9,270 | $ | 1,837 | $ | 11,107 |
| Adjusted Provisioning Fee Paid to JOBA: | $ | 4,848 | | | | |

| | | |
|---|---|---|
| Actual Provisioning Fee Paid: | $ 12,488 | (a) |
| Adjusted Provisioning Fee: | $ 4,848 | (b) |
| Overpayment: | $ 7,641 | (c)=(a-b) |

**Overpayment as a Percent of the Actual
Provisioning Fee Paid:**               **61.2%** (d)=(c/a)

<1> Calculation of what the provisioning fee would have been if the contract rate and historical
    seller/provider split (60/40) had been used to determine the provision payment.
<2> Gross sales under current contract pricing provided by Voice-Tel management. Allocation to Interfranchise
    and Amway based on allocation percentage from actual July 2002 provisioning statement.
<3> Interfranchise reduction assumed to be the same under both scenario's. Amway reduction related
    to royalties, marketing and information services assumed to be 15% of Amway gross revenue.

# Voice-Tel Enterprises  v. JOBA, Inc.
## Provisioning Fee Overpayment Support - Scenario 2        Schedule 3.25

### Reproduction of Actual Provisioning Fee Statement

|                            | Interfranchise | Amway | Total Gross |
|----------------------------|---------------|-------|-------------|
| October 2002 Gross Sales:  | $    12,951   | $   2,157 | $    15,108 |
| Reductions:                | $      (672)  | $    (324) | $      (996) |
| Net Totals:                | $    12,279   | $   1,834 | $    14,113 |
| Provisioning Fee Paid to JOBA: | $    14,113 | | |

### Adjusted Provisioning Fee Statement <1>

|                            | Interfranchise | Amway | Total Gross |
|----------------------------|---------------|-------|-------------|
| October 2002 Gross Sales <2>: | $    11,275 | $   1,878 | $    13,153 |
| Reductions <3>:            | $      (672)  | $    (282) | $      (954) |
| Net Totals:                | $    10,603   | $   1,596 | $    12,199 |
| Adjusted Provisioning Fee Paid to JOBA: | $     5,261 | | |

|                            |       |        |
|----------------------------|-------|--------|
| Actual Provisioning Fee Paid: | $    14,113 | (a) |
| Adjusted Provisioning Fee:   | $     5,261 | (b) |
| Overpayment                  | $     8,851 | (c)=(a-b) |

**Overpayment as a Percent of the Actual**
**Provisioning Fee Paid:**                    **62.7%** (d)=(c/a)

<1> Calculation of what the provisioning fee would have been if the contract rate and historical
    seller/provider split (60/40) had been used to determine the provision payment.
<2> Gross sales under current contract pricing provided by Voice-Tel management. Allocation to Interfranchise
    and Amway based on allocation percentage from actual October 2002 provisioning statement.
<3> Interfranchise reduction assumed to be the same under both scenario's. Amway reduction related
    to royalties, marketing and information services assumed to be 15% of Amway gross revenue.

## Voice-Tel Enterprises  v. JOBA, Inc.
## Provisioning Fee Overpayment Support - Scenario 2          Schedule 3.26

### Reproduction of Actual Provisioning Fee Statement

|  | Interfranchise | Amway | Total Gross |
|---|---|---|---|
| January 2003 Gross Sales: | $   9,080 | $   2,914 | $   11,994 |
| Reductions: | $     (523) | $     (437) | $     (960) |
| Net Totals: | $   8,557 | $   2,477 | $   11,033 |
| Provisioning Fee Paid to JOBA: | $   11,033 |  |  |

### Adjusted Provisioning Fee Statement <1>

|  | Interfranchise | Amway | Total Gross |
|---|---|---|---|
| January 2003 Gross Sales <2>: | $   9,899 | $   3,176 | $   13,076 |
| Reductions <3>: | $     (62) | $     (476) | $     (538) |
| Net Totals: | $   9,838 | $   2,700 | $   12,538 |
| Adjusted Provisioning Fee Paid to JOBA: | $   5,230 |  |  |

| | | |
|---|---|---|
| Actual Provisioning Fee Paid: | $   11,033 | (a) |
| Adjusted Provisioning Fee: | $   5,230 | (b) |
| Overpayment: | $   5,803 | (c)=(a-b) |

**Overpayment as a Percent of the Actual**
**Provisioning Fee Paid:**                    **52.6%** (d)=(c/a)

<1> Calculation of what the provisioning fee would have been if the contract rate and historical
   seller/provider split (60/40) had been used to determine the provision payment.
<2> Gross sales under current contract pricing provided by Voice-Tel management. Allocation to Interfranchise
   and Amway based on allocation percentage from actual January 2003 provisioning statement.
<3> Interfranchise reduction assumed to be the same under both scenario's. Amway reduction related
   to royalties, marketing and information services assumed to be 15% of Amway gross revenue.

# Voice-Tel Enterprises  v. JOBA, Inc.
## Provisioning Fee Overpayment Support - Scenario 2          Schedule 3.27

### Reproduction of Actual Provisioning Fee Statement

| | Interfranchise | Amway | Total Gross |
|---|---|---|---|
| April 2003 Gross Sales: | $ 8,634 | $ 2,676 | $ 11,310 |
| Reductions: | $ (445) | $ (401) | $ (846) |
| Net Totals: | $ 8,189 | $ 2,274 | $ 10,464 |
| | | | |
| Provisioning Fee Paid to JOBA: | $ 10,464 | | |

### Adjusted Provisioning Fee Statement <1>

| | Interfranchise | Amway | Total Gross |
|---|---|---|---|
| April 2003 Gross Sales <2>: | $ 9,488 | $ 2,940 | $ 12,429 |
| Reductions <3>: | $ (445) | $ (441) | $ (886) |
| Net Totals: | $ 9,043 | $ 2,499 | $ 11,543 |
| | | | |
| Adjusted Provisioning Fee Paid to JOBA: | $ 4,971 | | |

| | | |
|---|---|---|
| Actual Provisioning Fee Paid: | $ 10,464 | (a) |
| Adjusted Provisioning Fee: | $ 4,971 | (b) |
| Overpayment | $ 5,492 | (c)=(a-b) |

**Overpayment as a Percent of the Actual**
**Provisioning Fee Paid:**              **52.5%** (d)=(c/a)


<1> Calculation of what the provisioning fee would have been if the contract rate and historical
seller/provider split (60/40) had been used to determine the provision payment.
<2> Gross sales under current contract pricing provided by Voice-Tel management. Allocation to Interfranchise
and Amway based on allocation percentage from actual April 2003 provisioning statement.
<3> Interfranchise reduction assumed to be the same under both scenario's. Amway reduction related
to royalties, marketing and information services assumed to be 15% of Amway gross revenue.

**Voice-Tel Enterprises  v. JOBA, Inc.**
**Provisioning Fee Regression Analysis <1>**                                    **Schedule 4**

| | Actual Provisioning Fee Paid | Time Trend (T) <1> | Dichotomous Variable (D) <1> | Dichotomous * Time Trend (DT) <1> | Natural Logarithm of Provisioning Fees Paid (PP) <1> | Predicted Natural Logarithm of Provisioning Fees Paid | Predicted Provisioning Fees | Adjusted Estimate of Overpayment of Provisioning Fees |
|---|---|---|---|---|---|---|---|---|
| May-97 | $ 29,862 | 1 | 0 | 0 | 10.304345 | 10.242106 | $ 28,060 | $ 12,587 |
| Jun-97 | $ 28,812 | 2 | 0 | 0 | 10.268559 | 10.251396 | $ 28,322 | $ 12,144 |
| Jul-97 | $ 28,400 | 3 | 0 | 0 | 10.254139 | 10.260687 | $ 28,586 | $ 11,971 |
| Aug-97 | $ 28,598 | 4 | 0 | 0 | 10.261084 | 10.269978 | $ 28,853 | $ 12,054 |
| Sep-97 | $ 28,445 | 5 | 0 | 0 | 10.255727 | 10.279269 | $ 29,123 | $ 11,990 |
| Oct-97 | $ 27,816 | 6 | 0 | 0 | 10.233349 | 10.288560 | $ 29,394 | $ 11,724 |
| Nov-97 | $ 27,935 | 7 | 0 | 0 | 10.237619 | 10.297851 | $ 29,669 | $ 11,774 |
| Dec-97 | $ 27,721 | 8 | 0 | 0 | 10.229929 | 10.307142 | $ 29,946 | $ 11,684 |
| Jan-98 | $ 28,236 | 9 | 0 | 0 | 10.248337 | 10.316433 | $ 30,225 | $ 11,901 |
| Feb-98 | $ 27,806 | 10 | 0 | 0 | 10.232995 | 10.325724 | $ 30,507 | $ 11,720 |
| Mar-98 | $ 28,769 | 11 | 0 | 0 | 10.267053 | 10.335015 | $ 30,792 | $ 12,126 |
| Apr-98 | $ 29,480 | 12 | 0 | 0 | 10.291482 | 10.344306 | $ 31,080 | $ 12,426 |
| May-98 | $ 29,872 | 13 | 0 | 0 | 10.304687 | 10.353597 | $ 31,370 | $ 12,591 |
| Jun-98 | $ 30,332 | 14 | 0 | 0 | 10.319965 | 10.362888 | $ 31,662 | $ 12,785 |
| Jul-98 | $ 30,778 | 15 | 0 | 0 | 10.334569 | 10.372179 | $ 31,958 | $ 12,973 |
| Aug-98 | $ 30,374 | 16 | 0 | 0 | 10.321357 | 10.381469 | $ 32,256 | $ 12,803 |
| Sep-98 | $ 30,762 | 17 | 0 | 0 | 10.334044 | 10.390760 | $ 32,557 | $ 12,966 |
| Oct-98 | $ 31,154 | 18 | 0 | 0 | 10.346687 | 10.400051 | $ 32,861 | $ 13,131 |
| Nov-98 | $ 31,938 | 19 | 0 | 0 | 10.371552 | 10.409342 | $ 33,168 | $ 13,462 |
| Dec-98 | $ 33,904 | 20 | 0 | 0 | 10.431302 | 10.418633 | $ 33,478 | $ 14,291 |
| Jan-99 | $ 35,368 | 21 | 0 | 0 | 10.473575 | 10.427924 | $ 33,790 | $ 14,908 |
| Feb-99 | $ 33,689 | 22 | 0 | 0 | 10.424932 | 10.437215 | $ 34,106 | $ 14,200 |
| Mar-99 | $ 34,219 | 23 | 0 | 0 | 10.440523 | 10.446506 | $ 34,424 | $ 14,423 |
| Apr-99 | $ 39,047 | 24 | 0 | 0 | 10.572516 | 10.455797 | $ 34,745 | $ 16,458 |
| May-99 | $ 39,329 | 25 | 0 | 0 | 10.579729 | 10.465088 | $ 35,070 | $ 16,577 |
| Jun-99 | $ 40,637 | 26 | 0 | 0 | 10.612428 | 10.474379 | $ 35,397 | $ 17,128 |
| Jul-99 | $ 31,818 | 27 | 0 | 0 | 10.367785 | 10.483670 | $ 35,727 | $ 13,411 |
| Aug-99 | $ 40,305 | 28 | 0 | 0 | 10.604218 | 10.492961 | $ 36,061 | $ 16,988 |
| Sep-99 | $ 42,015 | 29 | 0 | 0 | 10.645781 | 10.502252 | $ 36,397 | $ 17,709 |
| Oct-99 | $ 38,826 | 30 | 0 | 0 | 10.566848 | 10.511542 | $ 36,737 | $ 16,365 |
| Nov-99 | $ 45,808 | 31 | 0 | 0 | 10.732219 | 10.520833 | $ 37,080 | $ 19,308 |
| Dec-99 | $ 43,741 | 32 | 0 | 0 | 10.686034 | 10.530124 | $ 37,426 | $ 18,437 |
| Jan-00 | $ 43,736 | 33 | 0 | 0 | 10.685923 | 10.539415 | $ 37,775 | $ 18,435 |
| Feb-00 | $ 47,033 | 34 | 0 | 0 | 10.758614 | 10.548706 | $ 38,128 | $ 19,825 |
| Mar-00 | $ 41,404 | 35 | 0 | 0 | 10.631128 | 10.557997 | $ 38,484 | $ 17,452 |
| Apr-00 | $ 45,432 | 36 | 0 | 0 | 10.723975 | 10.567288 | $ 38,843 | $ 19,150 |
| May-00 | $ 42,497 | 37 | 0 | 0 | 10.657198 | 10.576579 | $ 39,206 | $ 17,913 |
| Jun-00 | $ 41,909 | 38 | 0 | 0 | 10.643264 | 10.585870 | $ 39,572 | $ 17,665 |
| Jul-00 | $ 41,443 | 39 | 0 | 0 | 10.632064 | 10.595161 | $ 39,941 | $ 17,468 |
| Aug-00 | $ 41,673 | 40 | 0 | 0 | 10.637618 | 10.604452 | $ 40,314 | $ 17,565 |
| Sep-00 | $ 38,499 | 41 | 0 | 0 | 10.558387 | 10.613743 | $ 40,690 | $ 16,227 |
| Oct-00 | $ 38,285 | 42 | 0 | 0 | 10.552818 | 10.623034 | $ 41,070 | $ 16,137 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Nov-00 | $ | 40,250 | 43 | 0 | 0 | 10.602872 | 10.632324 | $ 41,453 | $ 16,965 |
| Dec-00 | $ | 37,845 | 44 | 0 | 0 | 10.541251 | 10.641615 | $ 41,840 | $ 15,952 |
| Jan-01 | $ | 39,908 | 45 | 0 | 0 | 10.594343 | 10.650906 | $ 42,231 | $ 16,821 |
| Feb-01 | $ | 35,892 | 46 | 0 | 0 | 10.488276 | 10.660197 | $ 42,625 | $ 15,129 |
| Mar-01 | $ | 34,232 | 47 | 0 | 0 | 10.440911 | 10.669488 | $ 43,023 | $ 14,429 |
| Apr-01 | $ | 37,157 | 48 | 0 | 0 | 10.522897 | 10.678779 | $ 43,425 | $ 15,662 |
| May-01 | $ | 38,654 | 49 | 0 | 0 | 10.562395 | 10.688070 | $ 43,830 | $ 16,292 |
| Jun-01 | $ | 32,696 | 50 | 1 | 50 | 10.394999 | 10.153268 | $ 25,675 | $ 13,781 |
| Jul-01 | $ | 31,407 | 51 | 1 | 51 | 10.354777 | 10.107881 | $ 24,536 | $ 13,238 |
| Aug-01 | $ | 28,345 | 52 | 1 | 52 | 10.252207 | 10.062493 | $ 23,447 | $ 11,947 |
| Sep-01 | $ | 23,150 | 53 | 1 | 53 | 10.049738 | 10.017106 | $ 22,406 | $ 9,758 |
| Oct-01 | $ | 17,882 | 54 | 1 | 54 | 9.791524 | 9.971719 | $ 21,412 | $ 7,537 |
| Nov-01 | $ | 17,733 | 55 | 1 | 55 | 9.783157 | 9.926332 | $ 20,462 | $ 7,474 |
| Dec-01 | $ | 17,836 | 56 | 1 | 56 | 9.788950 | 9.880945 | $ 19,554 | $ 7,518 |
| Jan-02 | $ | 17,017 | 57 | 1 | 57 | 9.741975 | 9.835557 | $ 18,687 | $ 7,173 |
| Feb-02 | $ | 17,034 | 58 | 1 | 58 | 9.742984 | 9.790170 | $ 17,857 | $ 7,180 |
| Mar-02 | $ | 15,609 | 59 | 1 | 59 | 9.655630 | 9.744783 | $ 17,065 | $ 6,579 |
| Apr-02 | $ | 15,351 | 60 | 1 | 60 | 9.638957 | 9.699396 | $ 16,308 | $ 6,471 |
| May-02 | $ | 13,243 | 61 | 1 | 61 | 9.491212 | 9.654009 | $ 15,584 | $ 5,582 |
| Jun-02 | $ | 12,431 | 62 | 1 | 62 | 9.427947 | 9.608621 | $ 14,893 | $ 5,240 |
| Jul-02 | $ | 12,488 | 63 | 1 | 63 | 9.432559 | 9.563234 | $ 14,232 | $ 5,264 |
| Aug-02 | $ | 13,705 | 64 | 1 | 64 | 9.525508 | 9.517847 | $ 13,600 | $ 5,777 |
| Sep-02 | $ | 13,796 | 65 | 1 | 65 | 9.532115 | 9.472460 | $ 12,997 | $ 5,815 |
| Oct-02 | $ | 14,113 | 66 | 1 | 66 | 9.554818 | 9.427073 | $ 12,420 | $ 5,948 |
| Nov-02 | $ | 10,992 | 67 | 1 | 67 | 9.304908 | 9.381685 | $ 11,869 | $ 4,633 |
| Dec-02 | $ | 10,913 | 68 | 1 | 68 | 9.297727 | 9.336298 | $ 11,342 | $ 4,600 |
| Jan-03 | $ | 11,033 | 69 | 1 | 69 | 9.308686 | 9.290911 | $ 10,839 | $ 4,651 |
| Feb-03 | $ | 11,329 | 70 | 1 | 70 | 9.335082 | 9.245524 | $ 10,358 | $ 4,775 |
| Mar-03 | $ | 11,080 | 71 | 1 | 71 | 9.312940 | 9.200137 | $ 9,898 | $ 4,670 |
| Apr-03 | $ | 10,464 | 72 | 1 | 72 | 9.255658 | 9.154749 | $ 9,459 | $ 4,410 |
| May-03 | $ | 9,392 | 73 | 1 | 73 | 9.147611 | 9.109362 | $ 9,040 | $ 3,959 |
| Jun-03 | $ | 8,901 | 74 | 1 | 74 | 9.093866 | 9.063975 | $ 8,638 | $ 3,752 |
| Totals | | $ 2,139,583 | | | | | | $ 2,125,858 | |
| | | | | **Adjusted Estimate of Overpayment of Provisioning Fees** | | | | | **$ 901,834** |

<1> A trend model of the following form has been estimated:

$$LnPP = b_1 + b_2 T + b_3 D + b_4 DT + e$$

where the $b$'s are unknown coefficients and '$e$' is a stochastic disturbance term. In this model $b_1$ provides an estimate of the natural logarithm of provisioning payments for period zero, $b_2$ is the growth rate in provisioning payments for the earlier (pre-Amway account loss) period, $b_3$ is the estimated difference in the intercept of the trend line attributable to losing the Amway account and $b_4$ is the difference in the growth rates in provisioning payments due to losing the Amway account. (Note: June 2001 was chosen as the 'start' date for estimating the post-Amway sales decline. According to PTEK Holding's Inc. 2001 10-K, Voice-Tel filed two complaints against Quixtax, Inc. and Alticor, Inc. f/k/a Amway Corporation on May 14, 2001.)

The results of the general model, the first listed below, indicate that all variables are statistically significant at the .01 level and that the model explains approximately 95% of the variation in the natural logarithm of provisioning fees. *The second model refers to a trend computed just for the period after the loss of the Amway account and the third refers to a trend computed for only the period prior to losing Amway.* All three of the models confirm the change in the intercept and the growth rate in provisioning fees. The fourth model presented is a simple trend *estimate of the amounts overpaid for the periods in which data is available to estimate overpayments* (Nov. 01, Jan. 02, Apr. 02, July 02, Oct. 02, Jan. 03, Apr. 03). This model explains over 86% of the variation in known overpayments. The coefficient estimate for the growth rate is statistically significant at the .01 level and is *very close to the estimated growth rate in provisioning payments that was estimated for the same period in* the second model (-4.54% in the second model and -3.95% in the fourth model). In fact, the two do not differ statistically at the .05 level of significance.

*Therefore, we have two pieces of statistical evidence that there is a common trend in overpayments and* provisioning fees paid for the period after June 2001. If provisioning fees and overpayments behave the same way after June 2001, there is strong evidence to believe that they also behaved the same way before June 2001. *Thus, if we add the growth rate in provisioning fees of approximately 5.5 percentage points to our initial percent* overpayment estimate of 36.7 percentage points, we derive an estimated percent overpayment estimate of 42.2% for the period prior to June 2001.

```
+--------------------------------------------------------------------+
| Ordinary    least squares regression    Weighting variable = none  |
| Dep. var. = LNPP     Mean=   10.17574104   , S.D.=  .4756802296     |
| Model size: Observations =       74, Parameters =   4, Deg.Fr.=    70 |
| Residuals:  Sum of squares= .8509147471   , Std.Dev.=       .11025 |
| Fit:        R-squared= .948485, Adjusted R-squared =        .94628 |
| Model test: F[ 3,   70] = 429.61,    Prob value =          .00000 |
| Diagnostic: Log-L =      60.2224, Restricted(b=0) Log-L =  -49.5153 |
|             LogAmemiyaPrCrt.=  -4.357, Akaike Info. Crt.=   -1.520 |
| Autocorrel: Durbin-Watson Statistic =   .67043,   Rho =    .66478 |
| Autocorrelation consistent covariance matrix for lags of  4 periods |
+--------------------------------------------------------------------+
+---------+--------------+----------------+--------+--------+----------+
|Variable | Coefficient  | Standard Error |t-ratio |P[|T|>t]| Mean of X|
+---------+--------------+----------------+--------+--------+----------+
 Constant    10.23281461  .37611444E-01  272.067   .0000
 T          .9290927280E-02 .18840584E-02  4.931   .0000    37.500000
 D           2.189812732   .37529016       5.835   .0000    .33783784
 DT        -.5467811976E-01 .55990546E-02 -9.766   .0000    20.945946
 (Note: E+nn or E-nn means multiply by 10 to + or -nn power.)
```

```
--> REJECT;D=0$
--> REGRESS;Lhs=LNPP;Rhs=ONE,T;Pds=4$
+-----------------------------------------------------------------------+
| Ordinary    least squares regression   Weighting variable = none     |
| Dep. var. = LNPP     Mean=  9.608621409    , S.D.=   .3568147679      |
| Model size: Observations =    25, Parameters =   2, Deg.Fr.=     23 |
| Residuals:  Sum of squares= .3776062727    , Std.Dev.=      .12813 |
| Fit:        R-squared= .876422, Adjusted R-squared =        .87105 |
| Model test: F[  1,   23] = 163.12,    Prob value =         .00000 |
| Diagnostic: Log-L =    16.9363, Restricted(b=0) Log-L =    -9.1997 |
|             LogAmemiyaPrCrt.=  -4.032, Akaike Info. Crt.=   -1.195 |
| Autocorrel: Durbin-Watson Statistic =   .47156,   Rho =    .76422 |
| Autocorrelation consistent covariance matrix for lags of  4 periods  |
+-----------------------------------------------------------------------+
+---------+--------------+----------------+--------+---------+----------+
|Variable | Coefficient  | Standard Error |t-ratio |P[|T|>t] | Mean of X|
+---------+--------------+----------------+--------+---------+----------+
 Constant    12.42262734    .38164495   32.550   .0000
 T          -.4536719248E-01 .57909797E-02  -7.838   .0000    62.000000
 (Note: E+nn or E-nn means multiply by 10 to + or -nn power.)

--> SAMPLE;ALL$
--> REJECT;D=1$
--> REGRESS;Lhs=LNPP;Rhs=ONE,T;Pds=4$
+-----------------------------------------------------------------------+
| Ordinary    least squares regression   Weighting variable = none     |
| Dep. var. = LNPP     Mean=   10.46508779    , S.D.=   .1657845933     |
| Model size: Observations =    49, Parameters =   2, Deg.Fr.=     47 |
| Residuals:  Sum of squares= .4733084744    , Std.Dev.=      .10035 |
| Fit:        R-squared= .641231, Adjusted R-squared =        .63360 |
| Model test: F[  1,   47] =  84.00,    Prob value =         .00000 |
| Diagnostic: Log-L =    44.1478, Restricted(b=0) Log-L =    19.0334 |
|             LogAmemiyaPrCrt.=  -4.558, Akaike Info. Crt.=   -1.720 |
| Autocorrel: Durbin-Watson Statistic =   .54389,   Rho =    .72805 |
| Autocorrelation consistent covariance matrix for lags of  4 periods  |
+-----------------------------------------------------------------------+
+---------+--------------+----------------+--------+---------+----------+
|Variable | Coefficient  | Standard Error |t-ratio |P[|T|>t] | Mean of X|
+---------+--------------+----------------+--------+---------+----------+
 Constant    10.23281461    .37611444E-01  272.067   .0000
 T           .9290927280E-02  .18840584E-02   4.931   .0000    25.000000
 (Note: E+nn or E-nn means multiply by 10 to + or -nn power.)
ayment growth
```

```
Regression with robust standard errors        Number of obs =        7
                                               F(  1,     5) =   104.98
                                               Prob > F      =   0.0002
                                               R-squared     =   0.8681
                                               Root MSE      =   .10561

------------------------------------------------------------------------------
            |               Robust
      LNOP  |    Coef.    Std. Err.       t     P>|t|     [95% Conf. Interval]
------------+-----------------------------------------------------------------
      var2  |  -.039536    .0038588    -10.25    0.000    -.0494552    -.0296167
     _cons  |  11.02191    .2276187     48.42    0.000      10.4368     11.60703
------------------------------------------------------------------------------
```

PP = Actual Provisioning Fees Paid
ADJESTOC = Adjusted Estimate of Overpayment of Provisioning Fees



## Voice-Tel Enterprises  v. JOBA, Inc.
### References                                    Schedule 5

Ekelund, Robert B., and Richard Ault, *Intermediate Microeconomics: Price Theory and Applications,* Lexington, MA:  D.C. Heath and Company, 1995.

Patrick A. Gaughan, *Measuring Commercial Damages*, New York, NY: John Wiley and Sons, Inc., 2000.

Gujarti, Damodar N., *Basic Econometrics,* New York, NY: McGraw-Hill, Inc., 1995 (3rd Edition).

Kaserman, David L., and John W. Mayo, *Government and Business: The Economics of AntiTrust and Regulation,*  New York, NY:  The Dryden Press, 1995

Pratt, Shannon P., Robert F. Reilly and Robert P. Schweihs, *Valuing A Business: The Analysis and Appraisal of Closely Held Companies*,  Chicago, IL:  Richard D. Irwin, 1996 (3rd Edition).

First Nat. Bank of Louisville v. Hurricane Elkhorn Coal Corp. II, 763 F.2d 188, 190 ( 6th Cir. 1985)

Hambleton v. R.G. Barry Corp., 12 Ohio St. 3d 179, 183 (1984)

Delahunt v. Cytodyne Technologies,241 F.Supp.2d 827, 836 (S.D.Ohio 2003)

# Voice-Tel Enterprises  v. JOBA, Inc.
## Hourly Rates

Schedule 6

| | Rate per Hour | |
|---|---|---|
| A. Frank Adams, III | $ | 200.00 |
| Cory Kennedy | $ | 165.00 |

In preparation for this report, I have approximately 110 hours of work.



June 11, 2003

Mary Donne Peters, Esq.
Gorby, Reeves & Peters, P.C.
21st Floor, 9-15 East Paces Ferry Road
Atlanta, GA 30326

RE:  Premiere Communications, Inc; Voicecom Telecommunication, LLC; Voice-tel
Enterprises, Inc; PTEK Holdings, Inc v. Joba, Inc and Digital Communication Services

Dear Ms. Peters:

This will confirm that Gorby, Reeves & Peters, P.C.   ("Counsel"), on behalf of Premiere
Communications, Inc; Voicecom Telecommunication, LLC; Voice-tel Enterprises, Inc;
PTEK Holdings, Inc (collectively referred to as "Client") has engaged Frank Adams
("Expert") to provide expert consulting and LECG, LLC ("LECG") to provide backup
support service(s) in the above-captioned matter, and sets forth the standard terms for
conducting such engagements.

Expert will lead this engagement and provide expert consulting services to Counsel at
Counsel's request and direction.   The services to be rendered on this engagement may
include providing expert testimony.     Expert understands that Counsel and Client are
interested in obtaining objective and independent analysis in connection with this matter.
Expert will report to Counsel verbally from time to time, and at Counsel's direction, on the
progress of the work and any preliminary findings.

Should Expert require backup support in order to efficiently handle tasks required by this
engagement, Expert will use the internal support services of LECG. If specific backup
support is required which cannot reasonably be provided by the support staff of LECG,
Expert, in consultation with Counsel may employ additional support personnel. Counsel
acknowledges that LECG's expert consultants, including Expert, are independent contractors
who determine, independently of LECG, the manner and means by which their services are
provided to Counsel.   Counsel and Client acknowledge that Expert determines his own
opinions related to testimony or work-product.   Such opinions are not those of LECG, its
employees or affiliates.   It is understood that prior to the submission of any statement
describing the nature of any opinions of Expert in this matter (e.g., answers to
interrogatories), Expert will be provided with the opportunity to review such statement for
accuracy.

LECG will administer all billings relating to this engagement.   Client shall compensate
LECG for services provided, which shall include Expert's fees, LECG backup support
hourly fees, and reimbursable costs and expenses. Mr. Adams' hourly fee is $200. LECG's



current staff rates are: Research Analyst, $85-120 per hour; Associate, $120-140 per hour; Senior Professional Staff, $155-210 per hour. Hourly rates may change in the future.

A copy of LECG's standard commercial terms, which Counsel and Client accept, is attached.

A retainer of $15,000 is required upon execution of this agreement.

The work undertaken by Expert and LECG in connection with this matter is being done for and under the direction of Counsel and, accordingly, is part of Counsel's work-product. LECG shall not disclose any confidential or privileged information to any third party; provided, however, that LECG may disclose confidential or privileged information (a) to LECG's employees, affiliates, vendors or agents who provide services in connection with this engagement, (b) with Counsel's written consent, or (c) when legally required to do so. Both parties agree that confidential and proprietary information will not be construed to include information that is available from public sources or sources not subject to obligations of confidentiality to Counsel or Client.

Counsel acknowledges that to the extent testimony is required in this matter, it may be necessary for Expert and LECG to object to requests by third parties to obtain information concerning material personal to Expert, proprietary to LECG or that may be related to client matters unrelated to this engagement. These objections may be necessary due to, among other things, existing confidentiality agreements or protective orders. Expert and LECG will use their best efforts to protect Counsel's and Client's interests consistent with the need to protect Expert's and LECG's personal and proprietary information, and to comply with Expert's and LECG's confidentiality obligations.

Counsel, Client, LECG or Expert may terminate this engagement upon 7 days written notice.

Sincerely,

John C. Burke
Chief Financial Officer
On behalf of LECG, LLC

AGREED AND ACCEPTED:

Gorby, Reeves & Peters, P.C.

By_____     Dated_____     PINCISS
    Mary Donne Peters, Esq.                                              013484



### LECG Standard Commercial Terms

LECG will bill for services on a monthly basis and will provide sufficient detail identifying services rendered and expenses incurred. In some circumstances, bills may be sent more frequently. LECG's billing statements shall be paid within thirty (30) days of the statement date. Counsel agrees on behalf of Client that it will review LECG's statement upon receipt and will advise LECG of any objection to or dispute with the statement and the work reflected in the statement within 30 days of receipt. In the event the Counsel or Client disputes part of a LECG bill, the undisputed part shall be paid within 30 days of receipt. Without liability, LECG and Expert reserve the right to withhold delivery of services, testimony, reports or data (written or oral) if the account on this engagement is not current. A late payment charge of 1 % per month (or the maximum rate permitted by law, whichever is less) will be added to any amounts more than 30 days past due. If the account on this engagement becomes overdue beyond 30 days, LECG and Expert may suspend all work on Counsel and Client's behalf.

In addition to professional fees, our bills will include actual expenses incurred, such as airfare, hotel, meal charges, express delivery and courier services, postage, report production, document management and external copy charges, plus charges for the costs of technology, internal copy charges, faxes, long distance telephone calls and other services.

Depending on the particulars of the project Expert and LECG are undertaking on Counsel and Client's behalf, Client may be asked to pay a retainer in advance of Expert's and LECG's performance of services. LECG will hold the retainer until it renders its final invoice, at which time it will apply the retainer to any outstanding balance due. Any portion of the retainer not so applied at the conclusion of the work will be returned to Client.

Any estimate of anticipated fees for services that may be provided to Counsel or Client prior to or during the course of the work is Expert's and LECG's best estimate of the effort that will be required to complete the services based on the information available to LECG and Expert at the time. Under no circumstances shall it be deemed a maximum fee or a fixed price.

In the event Expert or LECG is requested pursuant to subpoena or other legal process to produce any documents or to provide testimony relating to engagements for Counsel or Client in judicial or administrative proceedings to which LECG is not a party, Client shall reimburse Expert and LECG at standard billing rates for all professional time and expenses, including reasonable attorneys' fees, incurred in preparing for and responding to requests for documents and providing testimony.

LECG is a major consulting company which is engaged by many other companies and individuals. LECG's determination of conflicts is based on the substance of the work to be performed on an engagement as opposed to the parties involved. It is possible that some of Expert's and LECG's past, present or future clients will have disputes with and other matters relating to Counsel and Client during the course of and subsequent to this engagement. As a condition of this engagement, Counsel and Client agree that LECG and Expert may be engaged by parties with interests that are adverse to and may not be consistent with the interests of Counsel and Client. LECG and Expert reserve the right to accept engagements with other parties consistent with internal, prior practices, and will not be required to advise Counsel or Client of such engagements in the future. If appropriate, LECG and Expert will institute procedures to protect the confidentiality of information provided by Counsel on this engagement. Counsel's engagement of Expert and LECG is expressly conditioned on Counsel's and Client's agreement not to use the fact of LECG's or Expert's current

PINCISS
013485



or previous engagement by any opposing counsel or client in other matters as a means of enhancing or diminishing Expert's or LECG's credibility in conjunction with any appearance before a trier of fact.

Any controversy, dispute, or claim of whatever nature arising out of, in connection with, or in relation to the interpretation, performance or breach of this agreement, including any claim based on contract, tort, or statute, shall be resolved at the request of any party to this agreement, by final and binding arbitration, administered by and in accordance with the then existing Rules of Practice and Procedure of Judicial Arbitration & Mediation Services, Inc. (JAMS), or its successor entity, and judgment upon any reward rendered by the arbitrator may be entered by any State or Federal Court having jurisdiction thereof. Any such arbitration shall take place exclusively in Salt Lake City, UT. The prevailing party shall be entitled to reasonable attorneys' fees and costs incurred in enforcing this agreement through arbitration or otherwise and reasonable attorneys' fees and costs incurred in appealing or enforcing any judgment entered by the arbitrator in any court having jurisdiction. The parties shall not be liable to each other for any consequential, incidental, special or punitive damages, or for direct compensatory damages in excess of the fees actually received by LECG for the performance of services hereunder.

jobai-smi

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **VOICE-TEL ENTERPRISES,** | ) | |
| **L.L.C. (f/k/a VOICE-TEL** | ) | |
| **ENTERPRISES, INC.)** | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION |
| v. | ) | FILE NO.: 1-01-CV-3359  TWT |
| | ) | |
| **JOBA, INC. d/b/a  VOICE-TEL** | ) | |
| **OF SOUTH FLORIDA and** | ) | |
| **DIGITAL COMMUNICATIONS** | ) | |
| **SERVICES, INC., d/b/a VOICE-** | ) | |
| **TEL OF SOUTH FLORIDA** | ) | |
| Defendants/Third-Party | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **PREMIERE** | ) | |
| **COMMUNICATIONS, INC.** | ) | |
| **and PTEK HOLDINGS, INC.** | ) | |
| Third-Party Defendants. | ) | |

## CERTIFICATE OF SERVICE

This is to certify that I have this day served counsel for the opposing party in the foregoing matter with a copy of **PLAINTIFFS' EXPERT REPORT** by hand delivering a copy of same thereon to:

Matt Ames, Esq.
Meadows, Ichter & Bowers
14 Piedmont Center, Suite 1100
3525 Piedmont Road, N.E.
Atlanta, GA  30305

This _24_ day of September, 2003.

Michael J. Gorby, Esq.

945 East Paces Ferry Road
Suite 2150
Atlanta, GA  30326
404-239-1150
Facsimile:  (404) 239-1179